[S.F. Nos. 24348, 24349. Jan. 28, 1982.]

ASSEMBLY OF THE STATE OF CALIFORNIA et al.,
Petitioners, v.
GEORGE DEUKMEJIAN, as Attorney General, etc., et al.,
Respondents;
TIRSO DEL JUNCO, as Chairman, etc., et al., Real Parties in Interest.

[S.F. No. 24354. Jan. 28, 1982.]

PHILLIP BURTON, as United States Congressman et al.,
Petitioners, v.
MARCH FONG EU, as Secretary of State, etc., et al., Respondents;
TIRSO DEL JUNCO, as Chairman, etc., et al., Real Parties in Interest.

[S.F. No. 24356. Jan. 28, 1982.]

SENATE OF THE STATE OF CALIFORNIA et al., Petitioners, v.
MARCH FONG EU, as Secretary of State, etc., et al., Respondents;
TIRSO DEL JUNCO, as Chairman, etc., et al., Real Parties in Interest.

COUNSEL

Joseph Remcho, Robin B. Johansen, Kathleen J. Purcell, Mitchell Zimmerman, Nina R. Rivkind, Rosen & Remcho, Charles C. Marson, Steven F. Shatz and Kristen D. Balloun for Petitioners in Nos. 24348 and 24349.

Irell & Manella, Richard H. Borow, Jonathan H. Steinberg, Sheldon E. Eisenberg and Daniel Hays Lowenstein for Petitioners in No. 24354.

Tuohey & Barton, Conrad G. Tuohey, Teresa M. Ferguson, Ervin, Cohen & Jessup and Allan Browne for Petitioners in No. 24356.

Vilma S. Martinez, Morris J. Baller, John E. Huerta, Angel Manzano, Jr., Maria Rodriguez, Linda Wong, Elizabeth Meyer and Sideman, Meyer, Franco & Modrak as Amici Curiae on behalf of Petitioners.

George Deukmejian, Attorney General, Richard D. Martland, Assistant Attorney General, Robert Burton and Geoffrey L. Graybill, Deputy Attorneys General, for Respondent Attorney General.

Anthony L. Miller, Richard B. Maness and William P. Yee for Respondent Secretary of State.

John H. Larson, County Counsel, and Philip H. Hickok, Deputy County Counsel, for Respondent Los Angeles County Registrar of Voters.

Gibson, Dunn & Crutcher, Robert S. Warren, John J. Swenson, Mary Laura Davis, Robert E. Cooper, Daniel M. Kolkey, Gregg A. Amber, Musick, Peeler & Garrett, Charles E. Wiggins, Sheppard, Mullin, Richter & Hampton, John A. Sturgeon, Charles W. McCoy, Jr., Dobbs & Nielsen, James R. Parrinello, John E. Mueller and Marguerite Mary Leoni for Real Parties in Interest.

Michael J. Brady, Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Clifford, Jenkins & Brown, Arnold Anchordoquy, Falsetti, Crafts, Pritchard & Darling and Scott Edward Darling as Amici Curiae on behalf of Real Parties in Interest.

Michael J. Halliwell and Mark A. Wasser, County Counsel (Madera), as Amici Curiae.

---

OPINION

**BIRD, C. J.**—These consolidated mandate proceedings raise difficult questions concerning referenda challenges to the 1981 Congressional, Senate and Assembly reapportionment statutes passed by a majority of the Legislature and signed by the Governor. (Stats. 1981, chs. 535, 536, 537.)

(1) Are the referendum petitions defective because, in violation of Elections Code section 3516, subdivision (c), they required the signer to use his or her "address as registered to vote" rather than "residence address," thereby making it impossible for election officials to determine if the signers were qualified registered voters?

(2) Even if the petitions contain a substantial defect, should the court allow them to qualify so the referenda may be voted upon by the people of this state?

(3) Even if the petitions would otherwise technically qualify, may the referendum process be used to challenge reapportionment statutes? Does the stay provision of the referendum section of the state Constitution apply to the effective date of the reapportionment statutes?

(4) If the referenda stay the effect of the 1981 reapportionment statutes, how should the 1982 elections be conducted? Should the old, unconstitutional districts be adopted by this court and used in the 1982 elections? Should the court defer to the Legislature and adopt the newly drawn, equally apportioned districts enacted by the Legislature and signed into law by the Governor? If the court has no choice but to mandate the use of the 1981 congressional reapportionment plan, is there a legally compelling reason why the court should not also use the 1981 Assembly and Senate reapportionment plans?

## I.

### STATEMENT OF FACTS

In September 1981, the Legislature passed three reapportionment statutes revising the boundaries of the state's Congressional, Senate and Assembly districts respectively to conform to the results of the 1980 federal census.[1] These statutes were signed by the Governor and enrolled into law by the Secretary of State on September 16, 1981.

That same day, real parties in interest, the chairman of the California Republican Party and the Republican National Committee, began a petition drive aimed at qualifying for the ballot a referendum on each of these reapportionment statutes. (See Cal. Const., art. II, §§ 9, 10.)[2]

---

[1]Article XXI of the California Constitution requires that the Legislature reapportion Assembly, Senate and Congressional districts "[i]n the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade...."

[2]Sections 9 and 10 of article II provide as follows: "Sec. 9. (a) The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the state.

"(b) A referendum measure may be proposed by presenting to the Secretary of State, within 90 days after the enactment date of the statute, a petition certified to have been signed by electors equal in number to 5 percent of the votes for all candidates for Governor at the last gubernatorial election, asking that the statute or part of it be submitted to the electors.

"(c) The Secretary of State shall then submit the measure at the next general election held at least 31 days after it qualifies or at a special statewide election held prior to that general election. The Governor may call a special statewide election for the measure.

"Sec. 10. (a) An initiative statute or referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise. If a referendum petition is filed against a part of a statute the remainder shall not be delayed from going into effect.

"(b) If provisions of 2 or more measures approved at the same election conflict, those

The Attorney General prepared titles and summaries to appear on the face of the referenda. (See Cal. Const., art. II, § 10, subd. (d); Elec. Code, § 3503.)[3] The summaries stated that if signed by the requisite number of electors, the petitions would require the reapportionment statutes to be placed on the ballot for approval or rejection by the voters and would prevent the statutes from taking effect unless approved by a majority vote.

On November 18, 1981, real parties submitted their completed petitions to the Secretary of State. On December 15, the Secretary of State announced that the petitions contained the requisite number of signatures. (See Cal. Const., art. II, § 9, subd. (b) [petitions must contain signatures equalling 5 percent of the votes cast for all candidates for governor at the last gubernatorial election].) However, she also announced that she was refraining from directing the county clerks to place the referenda on the June ballot, pending this court's resolution of these mandate proceedings. (See §§ 3520-3523.) In the interim, she directed the county clerks and registrars to prepare to conduct the primary election under either the old election boundaries or the new districts approved by the Legislature.[4]

The instant mandate proceedings were filed by various members of the Assembly, Senate and House of Representatives and other interested parties. Petitioners attack defects in the referendum petitions which, they allege, render the petitions invalid. They also assert that even if the petitions are valid, the referenda do not operate to stay the implementation of the new reapportionment statutes. Petitioners seek writs of mandate compelling state and local officials to omit the referenda from

---

of the measure receiving the highest affirmative vote shall prevail.

"(c) The Legislature may amend or repeal referendum statutes. It may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval.

"(d) Prior to circulation of an initiative or referendum petition for signatures, a copy shall be submitted to the Attorney General who shall prepare a title and summary of the measure as provided by law.

"(e) The Legislature shall provide the manner in which petitions shall be circulated, presented, and certified, and measures submitted to the electors."

[3]All statutory references are to the Elections Code, unless otherwise noted.

[4]Two statewide elections are scheduled for 1982—a primary election on June 8 and a general election on November 2. All parties agree that the election districts used in the primary must also be used in the general election. If the referendum petitions qualify, the referenda will appear on the ballot in June.

the June ballot and to use the new districts in the 1982 elections. Mandate is an appropriate remedy under these circumstances. (See *Gage* v. *Jordan* (1944) 23 Cal.2d 794, 800 [147 P.2d 387] [mandate proper to compel Secretary of State to omit initiative measure from ballot]; *Legislature* v. *Reinecke* (*Reinecke I*) (1972) 6 Cal.3d 595 [99 Cal.Rptr. 481, 492 P.2d 385].)

This court issued alternative writs of mandate to resolve the impasse.

## II.

### CHALLENGES TO THE REFERENDUM PETITIONS

■ Petitioners contend that the referendum petitions fail to comply with several requirements of the Elections Code and are, therefore, fatally defective. The most serious of these asserted flaws is the failure of the petitions to require a signer to affix his or her residence address, as mandated by section 3516, subdivision (c).[5]

The referendum petitions were circulated by two methods: direct mail and public distribution by hand. Neither version contained a "residence address" instruction. Instead, both versions provided a space for each signer to affix an address, with the words "YOUR ADDRESS AS REGISTERED TO VOTE" printed beneath. In addition, the cover of the direct mail version, which was sent to all Republican voters at their addresses as registered, bore the following directions: "ATTENTION! ... WHEN SIGNING YOUR PETITION, PLEASE USE THE NAME *AND ADDRESS INFORMATION* EXACTLY AS IT IS LISTED HERE (*EVEN IF INCORRECT*) TO INSURE YOUR PETITIONS QUALIFY ...." (Italics added.)[6]

---

[5]Section 3516 provides, in pertinent part: "The petition sections shall be designed so that each signer shall personally affix his or her: ... (c) *Residence address*, giving street and number, or if no street or number exists, adequate designation of residence so that the location may be readily ascertained; ... [¶] Only a person who is a qualified registered voter at the time of signing the petition is entitled to sign it...." (Italics added.)

Section 41 contains similar provisions: "Wherever, by the Constitution or laws of this state, any ... referendum ... petition or paper, ... is required to be signed by voters, only a person who is a registered qualified voter at the time he signs the petition or paper is entitled to sign it. Each signer shall at the time of signing the petition or paper include ... his *place of residence*, giving street and number, and if no street or number exists, then a designation of his place of residence which will enable the location to be readily ascertained...." (Italics added.)

[6]At oral argument, counsel for real parties stated that "about half" or "slightly more than half" of the total signatures collected were gathered as a result of this direct mail effort.

Nowhere do the referendum petitions specifically call upon signers to provide the "residence address" information required by section 3516, subdivision (c). The reason for this requirement is quite simple. With minor exceptions, an individual must continue to reside at the address stated in his or her affidavit of registration in order to be qualified to vote. (See generally, Elec. Code, div. 1, ch. 2, §§ 300-320.) It is the duty of the county clerk or registrar of voters to compare a signer's current residence address on the petition with that individual's address as registered to vote in the records of registration maintained by the county clerk. If the addresses match, the requirement of section 3516 that the signer be "a qualified registered voter at the time of signing the petition" has been satisfied. However, without the petition signer's current residence address on the petition, it is *impossible* for the clerk to determine whether the signer was a "qualified registered voter."[7]

In the case of the petitions circulated by real parties, if the signer dutifully followed the instructions on those petitions and provided his or her "address as registered to vote" or "address ... as it is listed here (even if incorrect)," the address on the petition and the address in the records of registration would automatically be the same. Thus the clerk, whose examination is limited to a comparison of the petition and the records of registration,[8] can come to no other conclusion than that the signer was properly registered at the time he or she signed the petition.

---

[7]As the Secretary of State has informed this court, the elections laws of California have "long required voter registration as a prerequisite to signing initiative and referendum petitions. If it were otherwise, no reliable method could be devised to determine whether the measure had enough popular support to qualify to appear on the ballot."

[8]Section 3520, subdivision (d), provides that "the clerk or registrar of voters shall determine the number of qualified voters who have signed the petition ... from the records of registration...."

This limitation, which prohibits the clerk or registrar from examining any extrinsic evidence, has long been recognized by this state's appellate courts. (See *Wheelwright* v. *County of Marin* (1970) 2 Cal.3d 448, 456 [85 Cal.Rptr. 809, 467 P.2d 537]; *Ley* v. *Dominguez* (1931) 212 Cal. 587, 596 [299 P. 713]; *Schaaf* v. *Beattie* (1968) 265 Cal. App.2d 904, 910 [72 Cal.Rptr. 79]; *Ratto* v. *Board of Trustees* (1925) 75 Cal. App. 724, 726 [243 P. 466].)

The Secretary of State, in a November 16, 1981, advisory memorandum to county clerks and registrars on the subject of "SIGNATURE VERIFICATION ON ELECTIONS PETITIONS," makes reference to this well-settled principle and notes that newly enacted section 45 "codifies existing case law." (Stats. 1981, ch. 589.) That section provides, in pertinent part: "For purposes of verifying signatures on any ... referendum ... petition ..., the clerk shall determine that the residence address on the petition ... is the same as the residence address on the affidavit of registration.... [I]n the case of [a] ... referendum petition, if the information specified in Section 3516 is not contained in the petition, the affected signature shall not be counted as valid...."

Accordingly, 100 percent of the signatures determined by the clerk to be genuine would also be determined to be those of qualified registered voters. All would be counted as valid signatures for purposes of qualifying the referendum petition for the ballot. (See §§ 3520, 3521.)

Of course, that determination may not be correct. The signer may have moved to a new residence subsequent to registering without having reregistered or executed an address change with the county clerk. (See §§ 305, 315.) In such a situation, the signer would not be a "qualified registered voter at the time of signing the petition." Nevertheless, had he or she complied with the petition instructions regarding address, the clerk would be unable to discern that fact.

Far from being a mere technical shortcoming, real parties' failure to comply with the requirements of section 3516, subdivision (c), goes to the very heart of that section's purpose—to enable the clerk to ensure that petitions have been signed by those entitled to do so—and prevents that purpose from being effectuated.

The language of section 3516 is mandatory: "petition sections *shall* be designed so that each signer *shall* personally affix his or her ... [r]esidence address...." (Italics added.) In the past, when a petition's deficiencies have threatened the proper operation of the election procedures involved, this court has regularly upheld a refusal to file the petition.[9] (See *Muehleisen* v. *Forward* (1935) 4 Cal.2d 17, 20 [46 P.2d 969]; *Gerth* v. *Dominguez* (1934) 1 Cal.2d 239 [34 P.2d 135]; *Mayock* v. *Kerr* (1932) 216 Cal. 171 [13 P.2d 717].) In *Muehleisen*, the court stated that "[t]he question is not [one] of strict or liberal construction, nor is the case one of immaterial or unsubstantial departure from formal requirements. The ... provision is clear and requires no interpretation; and the requirements which were not followed are among the

---

[9]Contrary to the Assembly petitioners' assertion, the basis for a clerk's refusal to file petitions that do not meet the requirements of section 3516 is not found in the provisions of section 3511. Section 3511 provides: "Officers required by law to receive or file in their offices any initiative or referendum petition shall not receive or file any initiative or referendum petition which does not conform with the provisions of *this article*." (Italics added.)

Section 3511 does not apply to section 3516, since section 3511 and section 3516 are not in the same article of chapter 1 of division 5 of the Elections Code. Section 3511 is in article 1, which encompasses matters such as title and summary (§ 3502), petition headings (§ 3509), short titles (§ 3510), and full and correct copies of the title and text of proposed measures (§ 3515). Section 3516 is the first section of article 2.

most important elements of the ... system established by the statute." (*Muehleisen, supra*, 4 Cal.2d at p. 20.)

Real parties assert that they have substantially complied with the applicable Elections Code provisions regarding address. However, "[s]ubstantial compliance ... means *actual* compliance in respect to the substance essential to every reasonable objective of the statute." (*Stasher* v. *Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649].) The "reasonable objective" of section 3516, subdivision (c), is to enable the clerks to perform their duty to determine whether signers are "qualified registered voter[s] at the time of signing the petition" and thus "entitled to sign it." That objective is totally thwarted when signers are instructed to provide residences that may or may not reflect their current addresses. Under such circumstances, real parties' claim of substantial compliance cannot be sustained.

Real parties further contend that should their petitions be deemed deficient, the deficiency nevertheless should be excused as a form of harmless error, based on the fact that the total number of signatures collected was substantially in excess of the number of valid signatures needed to qualify the referenda for the ballot. Such a contention, however, begs the question—how many of the total signatures collected are actually valid? That is a question that cannot be answered because of the failure to request the signers' current residence addresses.

Real parties urge that the standard set forth in section 20024, defining the circumstances under which illegal votes may undo an election, should apply to the cases before this court. That section provides that "[a]n election shall not be set aside on account of illegal votes" unless the number of illegal votes would be sufficient to alter the election results, were they deducted from the total votes of the person whose right to office is being contested. Real parties' attempt to utilize that same test here is unsound. No comparable statutory provision exists for referendum petitions. Moreover, the postelection context is significantly different from a preballot-qualification setting. An election is a completed act, a fait accompli. In contrast, the circulation and qualification of referendum petitions are part of an ongoing process that portends, at most, the potential of an election.

Most importantly, even were a standard analogous to that of section 20024 applicable here, it would not be of assistance to real parties because of the very nature of the defect in their petitions. Without

residence address information, the county clerk is unable to identify accurately how many signers are not properly registered. Without an accurate count of such invalid signatures, no determination can be made as to whether or not the requisite number of valid signatures has been obtained.

Finally, real parties seek to excuse their noncompliance with section 3516, subdivision (c) by asserting that they were given incorrect advice by the Secretary of State and the Attorney General. However, the record suggests that real parties may well have been aware of the "residence address" requirements.

Petitioners have directed this court's attention to a document dated July 22, 1981, entitled "BACKSTOP—Operational Plan to Qualify The Referendum On Reapportionment." In addition to the title and date, the cover page also lists the name of Real Party del Junco, in his capacity as chairman of the California Republican Party. In Addendum C to this document, under the heading "LEGAL REQUIREMENTS," section 3516 is quoted in its entirety.

On September 17, 1981, three days *before* Real Party del Junco obtained from the Secretary of State's office the list of registered voters used in the mailings, the Secretary of State sent him a copy of referendum instructions provided to all the county clerks and registrars. Those instructions included a separate paragraph entitled "NOTE TO PROPONENT," specifically directing his attention to sections 3516 and 41, inter alia. Further, in October 1981, while the petitions were circulating, the Secretary of State's office telephoned counsel for del Junco to inform him that the direct mail petition's cover instruction to "please use the . . . address information exactly as it is listed here (even if incorrect)" was "questionable and could cause some problems." (Declaration of Richard B. Maness, staff counsel to the Secretary of State.)

Real parties' asserted reliance on the advice of a deputy attorney general in an informal letter to State Senator Kenneth Maddy is misplaced. The Attorney General is not the official charged with ensuring proper application of the state's elections laws. That is the role of the Secretary of State, California's chief elections officer. (Gov. Code, § 12172.5.) Such vicarious advice does not constitute "official" misinformation. Real parties also purport to rely on a 1980 handbook from the Secretary of State's office to excuse their failure to comply with section 3516, subdivision (c). However, that handbook *correctly* indi-

cates that the signer of an initiative petition should enter his or her "residence address."

These circumstances would not, by themselves, justify sustaining real parties' claim of excuse. However, real parties do raise more troubling justifications for their failure to substantially comply with the provisions of section 3516.

Real parties note that several past, pending, and currently circulating initiative and referendum measures have contained similar instructions regarding "address as registered to vote" or "address as registered."[10] Many of these petitions were subjected to vigorous legal challenge in the courts by competent counsel, and not once was the issue of the "residence address" defect raised by the challengers or addressed by the courts. (See, e.g., *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281].)

Further, real parties emphasize that from 1977 until 1980 the Secretary of State's California Ballot Initiative Handbook incorrectly used the phrase "address as registered to vote" in a recommended sample format for initiative petitions. When the error was corrected in a 1980 edition of the handbook, the Secretary of State's office neither publicly announced the correction. nor explained its significance. Apparently, neither the Secretary of State nor the county clerks have ever refused to accept a tendered referendum petition on the basis of this defect. Thus, real parties relied on a practice that not only had been accepted by the government entities charged with enforcing the referendum procedures but also had never been subjected to a challenge from any source.

---

[10]For example, from 1978 through 1980, the following constitutional and statutory initiative measures appeared on the ballot:

Property Tax Limitations and Exemptions—Initiative Constitutional Amendment (Prop. 13);

Murder—Penalty—Initiative Statute (1978 death penalty initiative);

School Employees—Homosexuality—Initiative Statute;

Limitation of Government Appropriations—Initiative Constitutional Amendment;

Taxation—Initiative Statute (energy business tax);

Rent control—Initiative Constitutional Amendment;

Taxation—Initiative Constitutional Amendment (limitations on personal income tax).

The following are measures which will appear on the ballot in 1982:

Water Facilities—Referendum Statute (Peripheral Canal);

Gift and Inheritance Taxes—Initiative Statute.

Finally, "'it has long been our judicial policy to apply a liberal construction to [the] power [of initiative and referendum] wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it. [Citations.]'" (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038], quoting *Mervynne v. Acker* (1961) 189 Cal.App.2d 558, 563-564 [11 Cal.Rptr. 340].)

Under the unusual and unique circumstances of this case, real parties' failure to comply with the requirements of section 3516, subdivision (c) will not be deemed to render the referendum petitions invalid. The Secretary of State should proceed to perform her duties, including those set forth in section 3520. All other petitions which either have qualified for the ballot or are in the circulation process as of the date this decision becomes final shall be treated similarly. However, all petitions which have not yet been provided by the Attorney General to the Secretary of State following the preparation of title and summary (§ 3503) will be subject to the express requirements of section 3516, subdivision (c) and their failure to so comply will render them invalid per se.

Petitioners raise three additional challenges to the technical sufficiency of the referendum petitions. First, they claim that the use of preprinted dates on the declarations signed by the petition circulators violated the Elections Code requirement that the declarations contain "[t]he dates between which all signatures were obtained." (See § 3519, subd. (d).) Second, petitioners assert that the text of the reapportionment statutes reprinted in the petitions contained errors, in violation of the requirement that "a full and correct copy of the title and text of the proposed measure[s]" be printed in each section of the petition. (See § 3515.) Finally, they allege that the use of small type size and of interleaved pages in the petitions made them virtually unreadable.

■ This court has stressed that technical deficiencies in referendum and initiative petitions will not invalidate the petitions if they are in "substantial compliance" with statutory and constitutional requirements. (*California Teachers Assn. v. Collins* (1934) 1 Cal.2d 202, 204 [34 P.2d 134].) A paramount concern in determining whether a petition is valid despite an alleged defect is whether the purpose of the technical requirement is frustrated by the defective form of the petition. "The re-*quirements of both the Constitution and the statute are intended to and*

do give information to the electors who are asked to sign the ... petitions. If that be accomplished in any given case, little more can.be asked than that a substantial compliance with the law and the Constitution be had, and that such compliance does no violence to a reasonable construction of the technical requirement of the law." (*Ibid.*) None of the three errors asserted here has interfered with the statutory purpose behind the technical regulations.

■ First, the petitions contained the phrase, "All signatures to this document were obtained between _____ and _____." The blanks were filled in with printed dates, 9/22/81 and 12/13/81 on the street petitions, and 9/17/81 and 12/15/81 on the direct mail petitions. Petitioners point out that the signatures were apparently obtained in a much shorter time range, between mid-October and mid-November.

Petitioners claim that the preprinted, longer time period impeded the ability of the clerks to determine whether those who signed the petitions were actually registered to vote at the time that they signed. However, the declarations literally complied with the Elections Code requirement that they contain "[t]he dates between which all signatures were obtained." (§ 3519, subd. (d).) The range of dates was sufficient to enable the clerks to make the important determination that all of the signatures were obtained within the proper time limits. Further, although the precise dates might have been useful to the clerks in determining the number of qualified voters who had signed the petitions, no showing has been made that the more general information provided prevented the clerks from carrying out that function. Nevertheless, the objectives of section 3519 will be better served in the future by requiring circulators personally to enter on their declarations the actual dates between which all the signatures on the petition were obtained. Preprinted dates are not a desirable substitute for such personal entries.

■ Second, the alleged errors in the text of the petitions concern only typographical errors in the listing of census tract numbers. The errors were so minor as to pose no danger of misleading the signers of the petitions. They, therefore, do not affect the validity of the petitions.

Finally, the petitions were fully readable, despite the size of the type. The color-coded referenda packets were sufficiently labeled and differentiated to meet the requirements of the substantial compliance test. Neither of these defects frustrated the signer's ability to understand

what he or she was being asked to sign. Accordingly, neither of them renders the petitions invalid.

## III.

### THE REFERENDUM STAY PROVISION

Next, the court must decide whether the referendum provisions of the state Constitution apply to reapportionment statutes passed by both houses of the Legislature and signed by the Governor. Article II, section 9, subdivision (a) provides: "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State."

Subdivision (b) sets forth the manner in which a referendum may be proposed. "A referendum measure may be proposed by presenting to the Secretary of State, within 90 days after the enactment date of the statute, a petition certified to have been signed by electors equal in number to 5 percent of the votes for all candidates for Governor at the last gubernatorial election, asking that the statute or part of it be submitted to the electors."

Subdivision (c) sets forth the procedure to be followed by the Secretary of State on receipt of a referendum measure which has been duly qualified. "The Secretary of State shall then submit the measure at the next general election held at least 31 days after it qualifies or at a special statewide election held prior to that general election . . ." if the Governor calls such a special election.

Petitioners do not seriously contend that reapportionment statutes are exempt from the referendum power. In passing, they observe that reapportionment statutes might be deemed "statutes calling elections" and, therefore, exempted from the referendum process under article II, section 9, subdivision (a). While it is obvious that a reapportionment statute relates to elections, it is equally clear that such statutes do not call elections. (*Boggs* v. *Jordan* (1928) 204 Cal. 207, 220 [267 P. 696]; *Ortiz* v. *Board of Supervisors* (1980) 107 Cal.App.3d 866, 872 [166 Cal.Rptr. 100].)

Petitioners do, however, seriously contend that the filing of a referendum against a reapportionment or any other statute does not stay

the effective date of the statute. The focus of the controversy thus centers initially on the interpretation of article II, section 10, subdivision (a) of the Constitution.

Subdivision (a) provides: "An initiative statute or referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise. *If a referendum petition is filed against a part of a statute the remainder shall not be delayed from going into effect.*" (Italics added.)

Petitioners acknowledge that the negative implication of the italicized language is that a referendum filed against the entirety of a statute stays that statute pending voter approval. An explicit stay provision was set forth in a predecessor to article II, section 10. Former article IV, section 1, which was repealed in 1966, read in pertinent part, "Upon presentation to the Secretary of State within 90 days after the final adjournment of the Legislature of a [qualified and certified referendum] asking that any act or section or part of any act of the Legislature be submitted to the electors for their approval or rejection, the Secretary of State shall submit to the electors for their approval or rejection, such act [or part thereof] . . . *and no such act [or part thereof] shall go into effect until and unless approved by a majority of the qualified electors voting thereon*; but if a referendum petition is filed against any section or part of any act the remainder of such act shall not be delayed from going into effect." (Italics added.)

Petitioners concede that while this predecessor article was in effect, this court assumed that the filing of a properly qualified referendum asking that a reapportionment statute be put to a popular vote stayed the effective date of such a statute. (See *Silver* v. *Brown* (1965) 63 Cal.2d 270, 277-278 [46 Cal.Rptr. 308, 405 P.2d 132] [dictum]; *Boggs* v. *Jordan, supra*, 204 Cal. 207, 211.)

Petitioners point out, however, that the referendum provisions of article IV of the California Constitution were revised in 1966, and in 1976 were placed in sections 9 and 10 of article II. One result of the 1966 revision was the elimination of the express stay provision of former article IV. Petitioners attach substantive significance to this omission. They argue that the filing of a referendum no longer stays the challenged statute, despite the clear negative implication to the contrary which remains in the current constitutional provision.

Petitioners ask too much of this court. The 1966 revision of article IV was intended "to shorten and simplify the Constitution, deleting unnecessary provisions. . . ." (*Associated Home Builders etc., Inc.* v. *City of Livermore, supra*, 18 Cal.3d 582, 595, fn. 12.) In commenting on the referendum provisions of former article IV, section 1, the Constitution Revision Commission declared that the proposed revision would effect only one substantive change—the effective date of a statute challenged by a referendum but subsequently approved by the voters.[11] "Otherwise," the commission declared, "no change in meaning has been effected" by the proposed revision. (Cal. Const. Revision Com., Proposed Revision (1966) at pp. 46-47.) There remains in the current provision, article II, section 10, subdivision (a), a clear negative implication that a statute challenged in its entirety by a duly qualified referendum is stayed from taking effect until it has been approved by the voters at the required election.

This interpretation is consistent with the nature of a referendum. "The referendum is the power of the electors to approve or reject statutes. . . ." (Cal. Const., art. II, § 9, subd. (a).) As the Secretary of State has pointed out, "In a REFERENDUM, VOTERS are asked to APPROVE the BILL which the Legislature has enacted ('YES' VOTE) or to DISAPPROVE ('NO' VOTE). . . . The question which is put to the voters is 'SHALL (the bill) BECOME LAW? (YES or NO).'" (Memo. from Sect. of State's office to county clerks and registrars of voters (Sept. 24, 1981).) Approval of the referendum is approval of the bill.

Thus, to declare, as does the first sentence of subdivision (a) of article II, section 10, that a "referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise . . ." is to say that the challenged bill takes effect the day after the election. Obviously, there would be no need to define the date on which the challenged law becomes effective if it were already in effect. (Compare, *Walters* v. *Cease* (Alaska 1964) 388 P.2d 263.)

Therefore, under the mandate of article II of the state Constitution, the filing of a valid referendum challenging a statute normally stays the implementation of that statute until after the vote of the electorate. The

---

[11]Under the former provision, such a statute became effective "five days after the date of the official declaration of the vote by the Secretary of State." As revised by the commission in 1966, the new provision declared that such statute would take effect "5 days after the date of the official declaration of the vote . . . unless the [statute] provides otherwise." (See former art. IV, § 24; compare, art. II, § 10, subd. (a).)

statute takes effect only if approved by the voters. No express provision in article II excludes reapportionment statutes from the reach of the referendum process or from application of the stay.[12]

## IV.

### ALTERNATIVES AVAILABLE TO THE COURT FOR 1982 ELECTIONS

There remains the problem as to what districts are to be used for the 1982 primary and general elections. Absent the filing of referenda challenging the 1981 reapportionment statutes, each of those laws would have gone into effect on January 1, 1982. (See Cal. Const., art. IV, § 8, subd. (c).) But referenda have been filed, and this court has concluded that they are valid and that their filing stays the date upon which the challenged statutes become law unless and until they are approved by the voters. As a result, the new districts, although presumptively valid, are not now in effect.

The old districting scheme, in effect since its establishment by this court in 1973 (see *Legislature* v. *Reinecke* (*Reinecke IV*) (1973) 10 Cal.3d 396 [110 Cal.Rptr. 718, 516 P.2d 6]), no longer meets the one-person, one-vote requirement embodied in the equal protection clauses of our state and federal Constitutions. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) All parties agree that the population changes revealed by the 1980 census demonstrate that the old districts contain population disparities that are clear violations of the state and federal Constitutions' one-person, one-vote mandate.[13] The old districts are, therefore, no longer valid. Moreover, the old congressional district boundaries have been repealed. (Stats. 1981, ch. 535, § 1.)[14]

With no valid districts in effect, the state's election machinery cannot operate. In order for the 1982 elections to proceed, some temporary dis-

---

[12]In the alternative, petitioners argue that reapportionment statutes are not "normal" statutes, since they represent the only practicable means by which a citizen's constitutional right to cast an equally weighted vote may be effectuated. Therefore, petitioners contend that the stay effected by the filing of the referenda in this case cannot be construed to prohibit absolutely the implementation of the 1981 reapportionment statutes. This question is addressed in the next section of this opinion, *post*, at pages 658-661.

[13]See discussion of the unconstitutional and impermissible population disparities in the old Assembly, Senate, and Congressional districts, *post*, at footnote 19 and at pages 665-667.

[14]No referendum was filed against that portion of chapter 535 which repealed the old congressional boundaries.

tricting scheme must be established. The impasse now confronting the state must be resolved.

Courts have repeatedly affirmed that reapportionment is a task best performed by the state legislatures. "[T]he institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality . . ." is the Legislature. (*Connor* v. *Finch* (1977) 431 U.S. 407, 414-415 [52 L.Ed.2d 465, 473-474, 97 S.Ct. 1828].) Since that is not a viable alternative prior to the June primary, this court is forced to assume the "unwelcome obligation" (*id.*, at p. 415 [52 L.Ed.2d at p. 474]) of stepping into the reapportionment fray.

The options available to the court are limited. Were time constraints less pressing, the court might consider requesting the Legislature to develop an interim plan. However, the June primary is less than five months away. Respondents Eu, the Secretary of State, and Panish, the Registrar of Voters of Los Angeles County, report that it is too late to use any districts except those in either the out-dated plan or the Legislature's plans. Computer programming requiring two to four months of work has already been performed for both of those plans. There is no time to do similar preliminary programming for any other plan. Further, no new districts could be put into effect in time to inform the electorate and the candidates of their districts before the primary election.[15]

Real parties argue that the 1981 reapportionment measures are not among the options this court may consider. However, decisions of the Supreme Court are to the contrary. Those decisions demonstrate that any practical alternative available to this court may be given consideration, including reapportionment plans which are not yet in effect and which are scheduled to be submitted to the electorate.

---

[15]Such practical considerations also render infeasible any attempt by this court to draft reapportionment plans of its own (see generally *Reinecke I, supra*, 6 Cal.3d at pp. 601-602) and obviate any possibility of giving consideration to alternative plans, such as that drawn up by the Rose Institute and submitted to this court by real parties.

It was suggested at oral argument that the court split the primary election into two parts. The court is reluctant to step in and make such sweeping changes in the electoral process. The consequences of such a proposal are far-reaching and belong more properly before the Legislature. A split primary could have a serious impact on the state treasury, voter turnout, the deadlines for the general election, the timing of other ballot measures, and the lead time for adequate computer programming, to name just a few examples.

The Supreme Court has repeatedly declared that regardless of the requirements of state constitutions, "the delay inherent in following [a] state constitutional prescription for approval of [reapportionment measures] cannot be allowed to result in an impermissible deprivation of [the citizens'] right to an adequate voice in the election of legislators to represent them." (*Roman* v. *Sincock* (1964) 377 U.S. 695, 711 [12 L.Ed.2d 620, 630, 84 S.Ct. 1449]; *Reynolds* v. *Sims* (1964) 377 U.S. 533, 584 [12 L.Ed.2d 506, 540, 84 S.Ct. 1362].)

When the delay caused by such state constitutional prescriptions conflicts with a citizen's federal constitutional right to cast an equally weighted vote, a court has the power to set aside the state constitutional provision. "Acting under general equitable principles," the court must determine whether circumstances require the immediate effectuation of the federal constitutional right. (*Roman* v. *Sincock, supra*, 377 U.S. at pp. 711-712 [12 L.Ed.2d at pp. 630-631].)

■ From these principles, it follows that a court, in the exercise of its equitable powers, may not only consider but also adopt reapportionment plans which are not yet final within the framework of a state constitution. This is precisely the action affirmed by the Supreme Court in *Reynolds* v. *Sims, supra*, 377 U.S. 533. In 1962, during the pendency of a federal suit challenging the apportionment of the Alabama Legislature, that body adopted two reapportionment plans. Neither was to take effect until the 1966 election. One of the plans was a proposed constitutional amendment which was scheduled to be submitted to the voters for ratification at the November 1962 general election. The other plan was statutory. It was enacted as a standby measure and was to take effect only if the voters rejected the constitutional amendment, or, should the amendment pass, if a court subsequently declared the amendment unconstitutional. (*Id.*, at pp. 537, 542-544 [12 L.Ed.2d at pp. 513, 515-517].)

After trial, the district court declared the existing apportionment of the Legislature unconstitutional. (*Id.*, at p. 545 [12 L.Ed.2d at p. 517].) The court fashioned a temporary remedy comprised of certain aspects of the two proposed plans for use in the 1962 election only. (*Id.*, at p. 552 [12 L.Ed.2d at p. 521].)

The Supreme Court held that "the District Court acted properly in considering [the] proposed plans, although neither was to become effective until the 1966 election and the proposed constitutional amendment

was scheduled to be submitted to the State's voters in November 1962." (*Id.*, at p. 570 [12 L.Ed.2d at p. 532].) Why? Because "[c]onsideration by the court below of the two proposed plans was clearly necessary ... in ascertaining what sort of judicial relief, if any, should be afforded ..." for the 1962 elections.[16] (*Id.*, at p. 571 [12 L.Ed.2d at p. 532]; see also, *Reinecke I, supra*, 6 Cal.3d at p. 602.)

Given the breadth of a court's equitable powers in reapportionment cases under federal law, it is clear that this court may give consideration to the Legislature's 1981 reapportionment plans, even though those plans are not yet in effect and are now scheduled to be submitted to a popular vote. In ascertaining the remedy to be applied in a given case, a court may give consideration to any practical alternative which is available.

In addition, a ruling that the stay provision of article II, section 10, subdivision (a) precludes consideration of the Legislature's reapportionment plans would create serious conflicts with other provisions of our state Constitution.

Article XXI, adopted in 1980, requires that the Legislature reapportion the Senate, Assembly, and Congressional districts "[i]n the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade...." It also requires that all members of the Legislature and Congress be elected from single-member districts. (Art. XXI, § 1, subd. (a).) Further, article I, section 7, the state equal protection clause, adopted in 1974, mandates a recognition of the one-person, one-vote principle.

To construe the referendum stay provision so as to prohibit consideration of the 1981 reapportionment plan would frustrate the requirements of both of these newly reaffirmed constitutional provisions. It would substantially delay redistricting of the state, despite the constitutional requirement that reapportionment occur immediately after the federal census. This court would be left with no practical alternative but to impose the old, now seriously malapportioned districts on the state, in violation of the equal protection clause. (See discussion, *ante*, at

---

[16]In his concurrence, Justice Stewart declared that "it was proper for the District Court, in framing a remedy, to adhere as closely as practicable to the apportionments approved by the representatives of the people of Alabama...." (*Id.*, at pp. 588-589 [12 L.Ed.2d at pp. 542-543].)

p. 658.) Further, the Legislature's reapportionment plan is the only available option that provides for 45 congressional districts, rather than the 43 formerly allotted to California. If that plan were eliminated from consideration, there would be no way to implement the constitutional requirement that all members of Congress be elected from single-member districts. (See discussion, *post*, at pp. 661-664.)

Nothing in our state Constitution dictates that the stay provision of article II should have more force and effect than the commands of article XXI or the equal protection clause of article I, section 7. Rather than promoting any particular constitutional provision at the expense of other, equally important provisions, this court must harmonize the various articles of our Constitution so as to minimize any potential conflicts. The conclusion that the referendum stay provision of article II does not remove the 1981 reapportionment statutes from this court's consideration saves that constitutional provision from a potential conflict with the mandates of article XXI and the state equal protection clause.

Petitioners' claim that the referendum provisions of the Constitution do not apply to reapportionment statutes seems unfounded. Similarly without merit is real parties' assertion that the qualification of the referenda prohibits this court from considering the Legislature's plans. The federal Constitution, federal precedent, and our own Constitution all require that the court weigh all the options currently available, including those challenged by the referenda.

V.

CONSTITUTIONAL MANDATES

The impasse facing the state as a result of the qualification of the referenda challenging the Legislature's reapportionment statutes leaves this court no choice but to resolve the pressing problem of what districts should be used in the upcoming primary and general elections. The only alternatives available are either the new plan approved by the Legislature and the Governor or the old districts used in the last decade.

From a practical point of view, which of these plans is available to this court for congressional reapportionment? California is now entitled to 45 representatives instead of 43. Real parties argue that this court should use the 43 old districts and fill the 2 new seats by statewide

elections. Every member of this court agrees that this is *not* a viable alternative.

As this court pointed out in *Reinecke I, supra,* 6 Cal.3d at page 603, federal law forbids the use of statewide elections to fill congressional seats. Section 2c of title 2 of the United States Code provides that, "In each State entitled . . . to more than one Representative under an apportionment made [by the President of the total number of Representatives among the several States], there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established . . . ."

■ Real parties assert that *Reinecke I* was wrong in holding that section 2c commands the election of congressional representatives from single-member districts. They contend that section 2a(c), of title 2 commands at-large elections. The flaw in their argument is that the legislative history of section 2c reveals, as does its plain language, that Congress intended 2c to supersede the provisions of section 2a(c).[17]

During the Senate debate on section 2c, proposed by Senator Howard Baker, the following colloquy occurred. After observing that by its terms section 2c would require that each state establish "by law" single-member districts for the election of its representatives, Senator Birch Bayh posed this question to Senator Baker: "*I would interpret 'by law' to mean if the reapportionment is done either by the State legislatures or by the court. I should like to know whether the Senator from Tennessee [Senator Baker] agrees with that interpretation.*" (Debate before the Senate, 113 Cong. Rec. 31719 (1967), italics added.)

Senator Baker responded that it was, of course, in the first instance the province of the legislatures to establish congressional districts and that a court should only intervene if the legislature failed to do so. (*Ibid.*)

Senator Bayh, stating that perhaps the Senator had misunderstood his question, went on to observe: "[I]f it is bad government for the legislature to say that Congressmen should run at large, then it is bad government for the court to have an entire group of Congressmen running at large in a State." (*Ibid.*)

---

[17]Section 2c of title 2 was enacted in 1967 as an amendment to House Bill No. 2275, a private immigration bill. (See 81 Stat. 581.)

Senator Baker responded: "... I agree...." (*Ibid.*)

Senator Bayh then returned to his original question. "When we say '... there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative,' we are talking about either of two situations—whether the legislature reapportions or whether the court reapportions." (*Id.*, at p. 31720.)

Senator Baker replied, "The Senator is correct." (*Ibid.*) During the floor debate, Senator Bayh again asked: "This will make it mandatory for all Congressmen to be elected by single-Member districts, whether the reapportionment is done by State legislatures or by a Federal court." Senator Baker responded: "That is my understanding." Thereafter, section 2c was adopted by the Senate by voice vote. (*Ibid.*)

The bill then went to the House for its consideration. An amendment was proposed to allow those states which had been conducting congressional elections at large (i.e., Hawaii and New Mexico) to do so for the 91st or next congressional election as well. (See Debate before the House, 113 Cong. Rec. 34032 (1967).) Most of the debate focused on the desirability of this proposed amendment. Little was said about the merits of the provision itself. However, one remark is instructive. "The language ... will prohibit any State from running [its representatives] at large in any future elections." (Remarks of Representative Smith, *id.*, at p. 34035.)

The measure passed the House, as amended, and was returned to the Senate. (See Debate before the Senate, 113 Cong. Rec. 34364 (1967).) There, the debate focused on whether the House amendment allowing Hawaii and New Mexico to elect their representatives at large in 1968 should be accepted. (See *id.*, at pp. 34364-34370.) In the course of that debate, it was observed that, "Beginning with the 1970 elections, and for every congressional election thereafter, every state of the Union, *with no exception*, must elect its Congressman [*sic*] from single-member districts." (Remarks of Sen. Fong, *id.*, at p. 34364, italics added.) At the close of debate, the Senate passed the bill as amended by the House. (*Id.*, at pp. 34369-34370.)

Given the legislative history of section 2c and this court's observations in *Reinecke I, supra*, 6 Cal.3d at page 603, it is clear that the use

of the 43 old districts and an at-large election of the 2 new representatives would contravene the congressional mandate set forth in section 2c. This interpretation is consistent with the decisions of other state and federal courts.[18]

As this court stated in *Reinecke I, supra*, 6 Cal.3d at page 603, the mandate of Congress to elect all representatives from single-member districts is one with which this court fully agrees. "[T]o conduct statewide elections to fill [the new] congressional seats in a state of California's geographical size and large population would not only tremendously increase the burdens and expenses of effective campaigning but, by increasing the choices confronting the electorate ..., would seriously impede the casting of informed ballots." (*Ibid.*) Further, an at-large election would allow the voters of California to select *three* representatives instead of the *one* that they are entitled to under law.[19] The only practical and constitutional alternative available for use as a temporary court plan for this election year is the 1981 congressional reapportionment law. (Stats. 1981, ch. 535.)

If this court must adopt the 1981 congressional reapportionment plan so that the 1982 House elections can go forward, is there any reason this court should not also adopt the 1981 Assembly and Senate plans?

---

[18]There appear to be three pertinent cases: (1) *Whitcomb* v. *Chavis* (1971) 403 U.S. 124, 158, footnote 39 [29 L.Ed.2d 363, 384, 91 S.Ct. 1858] (observing that § 2c reinstated the single-member district requirement in effect prior to § 2a(c)); (2) *Preisler* v. *Secretary of State of Missouri* (*Preisler III*) (W.D.Mo. 1967) 279 F.Supp. 952, 968-969 (observing that when § 2c became law, the court "was relieved of the prior existing Congressional command [under § 2a(c)] to order that the 1968 ... congressional elections in Missouri be held at large ..." were the Missouri Legislature to fail to enact a valid reapportionment statute in time), affirmed 394 U.S. 526 [22 L.Ed.2d 519, 89 S.Ct. 1225]; and (3) *Simpson* v. *Mahan* (1971) 212 Va. 416 [185 S.E.2d 47, 48] (holding that the court could not order the state board of elections to certify congressional candidates for election at large).

[19]In addition, the old congressional districts are now seriously malapportioned. According to the figures presented to this court, old Congressional District 43 has a population of 866,687, 64.8 percent above the ideal population size, while old Congressional District 8 has a population of 439,310, 16.5 percent below the ideal. The vote of a member of former District 8 would, therefore, be worth almost twice that of a member of former District 43. Six of the old districts contain populations that vary by more than 20 percent from the ideal, 20 vary by 10 to 20 percent from the ideal, and 17 vary by less than 10 percent from the ideal population size.

United States Supreme Court standards for congressional districts are very strict. The court has declared unconstitutional a congressional districting plan containing disparities which ranged to 3.13 percent above and 2.84 percent below numerical equality. (*Kirkpatrick* v. *Preisler* (1969) 394 U.S. 526 [22 L.Ed.2d 519, 89 S.Ct. 1225].)

Although few definitive rules guide the choice of an interim election plan, decisions of the United States Supreme Court do provide standards.

■ The primary federal concern is equal protection—here, the principle of one-person, one-vote. Further, equitable considerations such as the potential disruption of the state's election process must also be considered. (*Reynolds* v. *Sims, supra*, 377 U.S. at p. 585 [12 L.Ed.2d 506, 541].) Thus, this court must adopt the plan that best ensures equal protection of the law while minimizing any disruptive impact on the election process. In addition, any decision by this court should recognize the basic rule that reapportionment is primarily a legislative task, undertaken by this court only when circumstances permit no alternative. (*Id.*, at p. 586 [12 L.Ed.2d at p. 541].)

■ A weighing of the diverse and at times conflicting factors involved in this case leads to the conclusion that the election plans developed by the Legislature in 1981 must be used, as a temporary measure, in the 1982 legislative elections.

■ The equal protection clauses of both the federal and state Constitutions (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7) mandate that this court adopt the reapportionment plan that most nearly meets the constitutional ideal, absent extraordinary circumstances. (*Cosner* v. *Dalton* (E.D.Va. 1981) 522 F.Supp. 350, 363-364; *Cummings* v. *Meskill* (D.Conn. 1972) 347 F.Supp. 1176, 1177; *Klahr* v. *Williams* (D.Ariz. 1970) 313 F.Supp. 148, 153; *Jones* v. *Falcey* (1966) 48 N.J. 25 [222 A.2d 101, 109-110]; see also *Reynolds* v. *Sims, supra*, 377 U.S. at p. 585 [12 L.Ed.2d at p. 541].)[20]

■ Given the imminence of the 1982 primary election, only two options are available. This court must choose between the two districting plans currently available, selecting that plan which more nearly

---

[20]This principle of law has been interpreted to mandate the use of a new reapportionment plan, developed through the legislative process, where it is less unconstitutional than the alternative. (See, e.g., *Cosner, supra; Cummings, supra*.) It has also been applied where the constitutionality of a reapportionment plan is undecided, but the disputed plan was constitutionally preferable to the old plan and time was too short to permit development of an alternative. (*Jones* v. *Falcey, supra*, 222 A.2d at p. 109 [although "the litigation ha[d] not run its course," the new plan would be used; the old statute was "far more distant from the constitutional goal" than the statute before the court].)

comports with the requirements of the federal and state equal protection clauses and is least disruptive of the electoral process.

The old districts contain enormous population variances. The population of the largest old Assembly district is more than 200 percent that of the smallest. The populations of the new districts appear to be within 4 to 7 percent of equality.[21] Clearly, the new districts are far closer to the constitutional goal than the old.[22]

According to figures supplied by real parties, the current population of the old 76th Assembly District (530,643) is 236 percent of the population of the old 16th Assembly District (224,488). The vote of a resident of the former 16th District would, therefore, be worth more than twice that of a resident of the former 76th District. Compared to the current ideal district size, the old 76th District is 79.4 percent greater than the ideal, while the old 16th District is 24.1 percent less than the ideal. The total deviation between the two districts is 103.5 percent.

Overall, 2 of the old Assembly districts vary by more than 50 percent from the ideal population size of 295,857; 2 vary by 30 to 50 percent from the ideal size; and 48 of the 80 districts vary by 10 to 30 percent from the ideal. Only 28 of the districts are within 10 percent of the ideal district size.

In the Senate, old Senate District 5 now contains 458,587 people, 22.5 percent less than the ideal number, while old Senate District 38 contains 904,725 people, 52.9 percent more than the ideal. Thus, the vote of a resident of former District 5 would be worth almost twice that of a resident of former District 38. The total deviation between the two districts is 75.4 percent. Real parties' figures show that the population

---

[21]Petitioners claim that the maximum population deviations are less than 4 percent. Real parties contend that according to the uncorrected district plans one Assembly district deviates by as much as 15 percent, but concede that the corrected districts are probably within 7 percent of absolute equality.

[22]This court passes no judgment on the constitutionality of the new districts. For the purposes of this decision, suffice it to say that the population disparities of the districts are admitted by all parties to be in the range of 4 to 7 percent. This opinion also does not reach the issue of "political gerrymandering" of the election district boundaries. However, it is noted in passing that a federal court has adopted as a temporary measure a redistricting plan with districts that "come closer to [population] equality," despite "the bizarre shapes and irregular boundaries of some of the districts created by the plan...." (*Cummings* v. *Meskill, supra,* 347 F.Supp. at p. 1177.)

of one old Senate district is more than 50 percent greater than the ideal; another is 41 percent greater than the ideal; 19 vary by 10 to 30 percent from the ideal; and 19 are within 10 percent of the ideal population size.

The Supreme Court has not established a rigid numerical limit for legislative districts. However, the high court has developed guidelines for permissible deviations. As summarized by one federal district court, a maximum deviation of less than 10 percent between the largest and smallest districts is permissible and need not be justified by the state. However, a maximum deviation of 10 to 16.4 percent is permissible only if the state can demonstrate that the deviation is the result of a rational state policy. A maximum deviation greater than 16.4 percent is intolerable under the equal protection clause. (*Sims* v. *Amos* (M.D.Ala. 1973) 365 F.Supp. 215, 222, affd. *sub nom. Wallace* v. *Sims* (1974) 415 U.S. 902 [39 L.Ed.2d 460, 94 S.Ct. 1394]; *Cosner* v. *Dalton, supra*, 522 F.Supp. at pp. 357-358; see also *White* v. *Regester* (1973) 412 U.S. 755 [37 L.Ed.2d 314, 93 S.Ct. 2332]; *Mahan* v. *Howell* (1973) 410 U.S. 315 [35 L.Ed.2d 320, 93 S.Ct. 979]; see 1 Dorsen et al., Political and Civil Rights in the United States (4th ed. 1976) pp. 1107-1108.) Under this standard, the old districting plan—with maximum deviations of 103.5 percent (Assembly) and 75.4 percent (Senate)—is a per se violation of the United States Constitution.

As the Supreme Court stated in *Reynolds* v. *Sims, supra*, 377 U.S. at page 585 [12 L.Ed.2d at page 541], "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that *no further elections are conducted under the invalid plan.*" (Italics added.) Further, the high court has held that a court-ordered plan, such as that which established California's old districts, must be held to higher standards than a state legislature's plan. (*Chapman* v. *Meier* (1975) 420 U.S. 1, 26 [42 L.Ed.2d 766, 784, 95 S.Ct. 1988].)

California's Constitution provides a further reason to prefer adoption of the Legislature's 1981 reapportionment plans rather than to perpetuate the out-dated, malapportioned districts followed in the past decade. Article XXI of the state Constitution, adopted in 1980, requires the Legislature to reapportion the state in the year following the federal

census. This constitutional provision expresses a clear mandate that properly apportioned districts be in effect by the time of the first election following the decennial census.

Use of the Legislature's 1981 plans will also minimize the potential disruption of the electoral and political processes of the state. At the primary, the new reapportionment plans will be either affirmed or rejected. The court cannot and should not attempt to predict the outcome of the referenda. The will of the people, except as already expressed through their chosen representatives, is as yet unspoken. The referenda may be voted up or down. *Both* possibilities must be considered in fashioning a temporary remedy that will do least violence to the orderly conduct of the 1982 elections, regardless of the ultimate result of the referenda.

California faces a unique situation in which the plan by which the elections should be conducted is the subject of a vote at those same elections. Use of the Legislature's 1981 plan for the 1982 elections minimizes any disruption of the electoral process. If the reapportionment statutes are ratified by the voters at the primary, use of them now will cause *no disruption at all*. The 1982 elections will proceed according to the new plan—a statute approved by the Legislature, the Governor, and the people of the state.

Real parties argue that use of the old legislative districts would cause less disruption. That conclusion, however, rests on an implicit and impermissible assumption—that the referenda will result in the rejection of the Legislature's reapportionment statutes. That is an assumption this court cannot legally make. To do so would thrust the court into the political realm, prejudging an issue which is exclusively for the voters of the state to decide.

If the court orders the use of the old districts in 1982 and the reapportionment statutes then are affirmed, the state will be faced with the anomalous situation of an election run under seriously malapportioned, unconstitutional districts, despite the fact that the Legislature, the Governor and the people of the state all have concurred in adopting a new reapportionment statute. The legislators elected in those malapportioned, unconstitutional districts would serve terms of two and four years before the districts chosen by the people and their elected representatives could be given effect.

If the reapportionment statutes are rejected at the primary election, some disruption of the election process will occur no matter which plan is adopted now. The Legislature will be faced with the task of formulating new districts in time for the 1984 elections. That new plan will be subject to possible challenge in the courts and by referendum. At least, however, if the new plans are adopted temporarily in June and November, the 1982 elections will be run under a districting plan that is far closer to federal and state constitutional mandates than the out-dated plan of the last decade.

In sum, then, giving equal weight to the possibilities that the referenda may succeed or fail, use of the 1981 reapportionment statutes *minimizes* the potential disruption of the electoral process. It eliminates the danger of the worst possible scenario—use of the old, unconstitutional plans in June and November despite approval of the new plans at the primary election. Further, the use of the 1981 reapportionment plans maximizes the likelihood that there will be no disruption at all.

Adoption of the Legislature's reapportionment plans for temporary use in 1982 also furthers the related goals of judicial restraint and deference to the Legislature. This court passes no judgment on the wisdom of the Legislature's 1981 plans or on the likelihood that the people will affirm or reject those statutes at the primary election. However, in choosing whether to use an out-of-date plan that no longer conforms to equal protection requirements or a new statute passed by the Legislature, the court cannot be blind to the fact that the Legislature and the Governor have given their assent to the latter plan. Although stayed by the referenda, these statutes were the product of the political give and take of the legislative branch of government, the branch delegated responsibility for reapportionment both by federal precedent and by California's Constitution.[23]

---

[23]The Supreme Court and the federal district courts have expressed a preference for redistricting plans that resemble the plans adopted by a state legislature. "Just as a federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution, we hold that a district court should similarly honor state policies in the context of congressional reapportionment. In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" (*White* v. *Weiser* (1973) 412 U.S. 783, 795 [37 L.Ed.2d 335, 346, 93 S.Ct. 2348], quoting *Whitcomb* v. *Chavis, supra*, 403 U.S. at p. 160 [29 L.Ed.2d 363, 385]; see also *Reynolds* v. *Sims, supra*, 377 U.S. at pp. 588-589 [12 L.Ed.2d 506, 542-543] [conc. opn. of Stewart, J.].)

Use of the old plan would also perpetrate a potentially grave injustice on the majority of the people of this state. The effect of reverting to the old plan would be to allow 5 percent of the voters, by signing referendum petitions, to delay implementation of a constitutionally required reapportionment plan for two to four years.[24] Not until 1986 would the voters in some Senate districts electing representatives this year have the opportunity to vote in properly apportioned districts. Although the Constitution of our state grants the power to initiate a referendum to 5 percent of the voters, it does *not* require that the effect of that referendum be articulated in a manner that does such serious injury to conflicting and equally compelling constitutional mandates. (See discussion, *ante*, at pp. 660-661.)

Any decision by this court requires a balancing of competing constitutional considerations. In light of the strong factors weighing in favor of the use of a revised, up-to-date reapportionment plan, it is simply untenable to argue that the constitutional provision on stays must be followed blindly, no matter what the cost to the equal protection clauses of the state and federal Constitutions and article XXI of the state Constitution.

Maintaining the old election districts for the upcoming election would raise troubling questions about the future of reapportionment in our state. It would create a serious risk that *every* reapportionment plan would be delayed at least two years before it could be implemented. Each decade, the losers in the reapportionment battle could obtain a two-year grace period on the strength of the signatures of 5 percent of the voters, thereby delaying implementation of the new plan until years after the referendum election. Cognizant of the seemingly interminable reapportionment lawsuits of the last two decades, this court should take care to avoid creating a system whereby delay becomes the rule and constitutionally required reapportionment may never be achieved within constitutionally imposed deadlines.

The decision to implement the 1981 reapportionment statutes for the 1982 elections will not circumvent the people's right to vote on those plans at the primary. The outcome of that vote will determine the fu-

---

[24]Indeed, language contained in a document entitled, "BACKSTOP—Operational Plan To Qualify the Referendum on Reapportionment," indicates that the circulators may have intended just such a result. "There are basically two alternatives available to us which could postpone the effective date of reapportionment until after the November 1982 elections...." (See, *ante*, at p. 650.)

ture of reapportionment for the rest of the decade. This court's decision affects *only* the districts to be used *temporarily* for the 1982 elections. It is an unfortunate but unavoidable consequence of the timing of the referenda that the results of those referenda must necessarily be one step behind the reality of the 1982 elections. For this one year only, the elections must be conducted in ignorance of the preference of a majority of the voters. This is the unhappy result of the unique situation now confronting the state. Further, use of the unconstitutional, out-dated plan would increase the likelihood that the will of the people, as expressed in the primary vote, might be thwarted.

It is important to remember that the Legislature's plans have not been rejected by the voters. The statutes have been placed on the ballot, based on the signatures of 5 percent or more of the actual number of votes cast for all candidates for Governor in the last gubernatorial election. The ultimate disposition of the plans, although put to a vote by the referendum petitions, is as yet undecided. Thus, this case is substantially different from *Reinecke I, supra,* 6 Cal.3d at page 595. There this court held that it would not order use of the results of a "truncated" legislative process absent "the most compelling considerations." (*Id.,* at p. 602.) The reapportionment bill in *Reinecke I* had been *vetoed* by the Governor. By way of contrast, the statutes here have never been rejected by any governmental entity. They were *signed* by the Governor and will be put to a vote of the people.

To use the adjective "truncated" to describe both of these situations would seriously stretch the descriptive power and distort the definition of the word. The legislative process in *Reinecke I* was "truncated" by a sharp, final veto by the Governor. The legislatiye process here has been lengthened but not terminated. A small percentage of the voters has exercised its right to put the question to a vote of the whole. Pending that vote, the legislative process here has been stalled but not derailed, slowed but not "truncated."

The situation facing this court today is distinguishable from *Reinecke I* in another crucial respect: the applicable law has changed in the intervening 10 years. First, the voters of the state amended the state Constitution in 1980 to provide, "In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature *shall* adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts. . . ." (Cal. Const., art. XXI, § 1, italics added.) This

provision replaced former provisions that had been declared unconstitutional on other grounds in 1965. (*Silver* v. *Jordan* (S.D.Cal. 1964) 241 F.Supp. 576, affd. *per curiam, Jordan* v. *Silver* (1965) 381 U.S. 415 [14 L.Ed.2d 689, 85 S.Ct. 1572].) The voters of the state have thus recently reaffirmed their commitment to the constitutional requirement that the Legislature adopt new apportionment lines immediately after the new census figures are available.

Since *Reinecke I*, this court has also held that our state's equal protection clause (see art. I, § 7), adopted in 1974, has "independent vitality" which at times may require greater protection than that afforded by the federal Constitution (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929]).

Finally, the years since *Reinecke I* have taught us that the courts cannot tolerate endless delays in the implementation of a constitutional reapportionment plan. *Reinecke* itself required four opinions before this court imposed a court-designed reapportionment plan on the state. (See *Legislature* v. *Reinecke, supra*, 6 Cal.3d 595; *Legislature* v. *Reinecke* (1972) 7 Cal.3d 92 [101 Cal.Rptr. 552, 496 P.2d 464]; *Legislature* v. *Reinecke* (1973) 9 Cal.3d 166 [107 Cal.Rptr. 18, 507 P.2d 626]; *Legislature* v. *Reinecke, supra*, 10 Cal.3d 396.) Court battles over reapportionment have frequently stretched far into the decade that the reapportionment plans were intended to serve. The courts must now seek remedies that will encourage prompt resolution of reapportionment disputes.

The calculus confronting this court as it determines the proper remedy for the 1982 elections is thus substantially different from that which faced the court 10 years ago in *Reinecke I*. The new plan carries with it the assent of both the Legislature and the Governor. Although it faces the possibility of rejection by the people, that is as yet only a possibility. On the other hand, the factors militating against use of the old districting plans are far stronger than they were in 1972. The equal protection clauses of both the state and federal Constitutions are less open to delay and stricter in their requirement of one-person, one-vote.[25] Fur-

---

[25]Prior to 1962, the United States Supreme Court consistently refused to consider claims that the malapportionment of legislative congressional districts deprived voters of a constitutionally protected right to fair representation. (See, e.g., *Colegrove* v. *Green* (1946) 328 U.S. 549 [90 L.Ed. 1432, 66 S.Ct. 1198]; *MacDougall* v. *Green* (1948) 335 U.S. 281 [93 L.Ed.2d 3, 69 S.Ct. 1]; *South* v. *Peters* (1950) 339 U.S. 276 [94 L.Ed.2d 834, 70 S.Ct. 641].) The court's decision in *Baker* v. *Carr* (1962) 369

ther, an amendment to the California Constitution has specifically reaffirmed the requirement of legislative reapportionment in the year following the federal census.

The *Reinecke I* solution—use of the old districts for legislative elections and the new districts for Congressional elections—is not helpful here. The suggestion that it be used today leads ineluctably to a logical conflict. If the court has the power to order use of the new plans for congressional races, a fact agreed to by every member of this court, it must be able to do the same for the state legislative districts. In 1982 the allure of the *Reinecke I* solution lies more in its value as a compromise than its theoretical neatness. And compromise between competing

---

U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691] signaled a dramatic shift in constitutional interpretation, holding that the federal Constitution requires adherence to the one-person, one-vote principle.

Subsequent reapportionment cases of the 1960's involved the at times painstaking initial application of this principle. (See, e.g., *Wesberry v. Sanders* (1964) 376 U.S. 1 [11 L.Ed.2d 481, 84 S.Ct. 526] [congressional districts]; *Reynolds v. Sims, supra*, 377 U.S. 533 [both houses of the legislatures].) The decisions of the early 1960's reflected a willingness to delay immediate implementation of this new constitutional mandate in order to give state governments an opportunity to revamp their electoral systems in an orderly manner. (See, e.g., *Reynolds, supra*, at pp. 585-586 [12 L.Ed.2d at pp. 541-542]; *WMCA, Inc., v. Lomenzo* (1964) 377 U.S. 633, 654-655 [12 L.Ed.2d 568, 580-581]; *Roman v. Sincock, supra*, 377 U.S. at pp. 711-712 [12 L.Ed.2d at pp. 630-631].)

The reapportionment cases of the 1970's refined the standards applicable to redistricting plans, developing more precise guidelines defining the degree of uniformity required by the Constitution. (See, e.g., *Mahan v. Howell, supra*, 410 U.S. 315; *Gaffney v. Cummings* (1973) 412 U.S. 735 [37 L.Ed.2d 298, 93 S.Ct. 2321]; *White v. Regester, supra*, 412 U.S. 755; *Sims v. Amos, supra*, 365 F.Supp. at p. 222 [standards for legislative reapportionment]; *White v. Weiser* (1973) 412 U.S. 783 [37 L.Ed.2d 335, 93 S.Ct. 2348] [congressional district standards].)

In the 1960's and 1970's, the standards applicable to reapportionment changed frequently as the United States Supreme Court articulated the constitutional imperatives with increasing precision. In the 1980's these standards are no longer in flux. The constitutional requirements are now clearly set forth for the guidance of both legislatures and courts. The uncertainties which required delay in the past two decades have been resolved.

The only published decision cited to this court that considers a legislative attempt to reapportion in light of the 1980 federal census, *Cosner v. Dalton, supra*, 522 F.Supp. at pages 363-364, reflects an unwillingness to perpetuate out-dated districts for even one more election. The *Cosner* court simply noted that the use in the 1982 elections of a districting plan based on the 1970 census "would effect great harm to the principle of one-person, one-vote." (*Id.*, at p. 363.) The court opted instead for a recent legislative plan, based on 1980 census data, that came far closer to population equality than the old districts. (*Id.*, at p. 364.)

The decision in *Cosner* is indicative of the rigor with which the constitutional standards must now be applied. In the 1980's there is no longer any justification for delay in the implementation of the one-person, one-vote mandate of our Constitutions.

political parties is a political solution, one that is inappropriate for a body whose members are sworn to uphold the constitutional right of the citizens of this state to vote in districts which respect the requirement that each person's vote has equal value.

## VI.

### CONCLUSION

It is with great reluctance that this court enters a dispute more properly resolved in the political environs of the state Legislature and at the ballot box. However, this court has been given no choice in the matter. The court must act to protect the right of the citizens of this state to vote in an orderly and constitutional fashion. A good faith effort has been made to meet the constitutional imperative of one-person, one-vote, while minimizing any disruption of the electoral or political processes and without intruding into the proper spheres of the coordinate branches of government.

Operating from a neutral judicial stance and postulating no predictions as to the probable outcome of the referenda on the proposed reapportionment plans, the court has ordered a temporary districting plan that best ensures equal protection of the law to the citizens of this state while doing the least violence to the election process this year.

Every member of this court agrees, and most parties concede, that the old, out-dated district plan of 1973 is unconstitutional and may not be used for the congressional elections. The only alternative open to the court is the reapportioned districts adopted by the Legislature and approved by the Governor. If the 1981 congressional reapportionment plan must of necessity be used in the 1982 elections, it is clear that there are no compelling reasons why the 1981 reapportionment statutes governing the Assembly and Senate should be discarded for the old, unconstitutional districts of 1973. This temporary plan allows the primary and general elections to be held in districts that more nearly comply with the constitutional mandate of one-person, one-vote.

By law, the court must adopt the plan which is most constitutional and least disruptive. If the court were to adopt the old district plan, it would not only do violence to our state and federal Constitutions, but

the action might be construed as an impermissible judicial statement about the success of the referenda.

The only way in which the adoption of the unconstitutional, old districts could be justified would be if this court were to pronounce a political conclusion that the reapportionment statutes will be rejected. However, this court is forbidden from making such political assumptions. Instead, this court is constrained to take a neutral look at the results under both the old and new districts should the referenda either pass or fail, in order to determine what alternative is least disruptive. When these different "scenarios" are laid out side by side, it becomes evident that use of the new districts is the less disruptive alternative.

If the old districts were adopted by this court now, but the 1981 reapportionment statutes were affirmed by the voters of this state at the primary, the old, unconstitutional districts would still have to be used in November. This would be the *most* disruptive remedy this court could fashion. The right of the people of this state to equally weighted votes would be denied at both the primary and general elections.

Thus, not only would the will of the people have been thwarted for two years in the case of the Assembly and four years in the case of the Senate, but the November election process would be totally disrupted, since the 1981 reapportionment approved by the Legislature, signed by the Governor, and adopted by the people could not go into effect. Why? Simply because of this court's ukase.

Under *no* circumstances could the use of the old districts be less disruptive than the use of the new districts. If the referenda fail, a new legislative reapportionment plan will have to be developed, regardless of which districts this court adopts for the 1982 elections.

Justice Richardson's opinion assumes that the "worst possible scenario" is the prospect that the state will have to vote in an additional set of districts if this court adopts the new districts and the referenda fail. However, in labeling this the worst scenario, the dissenting justices overlook the fact that it is only through the use of the new districts that the voters' rights to equal protection and to prompt implementation of the one-person, one-vote mandate will be honored. The *worst* scenario is one in which this crucial right is needlessly violated.

If the new districts are adopted and the referenda pass, there will be *no* disruption whatsoever. The dissenting opinions are understandably silent on this point. The Legislature will have no need to take any further reapportionment action for the remainder of the decade. The will of the people, as expressed in their referenda votes, will be given immediate effect in the November election.

There is an additional problem. If a referendum signed by 5 percent of the voters can stop a legislatively enacted reapportionment plan for a period of two or four years, even if it is subsequently adopted by the citizens at a statewide election, then a small minority could thwart the will of a majority of the citizens simply by obtaining a small number of signatures on a petition. Signing a petition would then become not only a request that a reapportionment statute be put to a vote of the people, but a sure-fire method by which to block the implementation of a crucial statute approved by the Assembly, the Senate, the Governor, and the people.

Thus, the adoption of the old districts by this court would have the detrimental effect in the future of encouraging anyone who does not like a legislative reapportionment plan, for whatever reason, to look immediately to the courts to undo it. It cannot be overlooked that if this court were to endorse that view, it would be encouraging a small, dissatisfied minority to force this court to reapportion the state at least once every 10 years. A more disasterous prospect for this court and the electoral process is difficult to imagine. It is neither wise nor just to place the burden of reapportionment, a basically political responsibility, on the courts of a state.

Certainly, the courts should continue to serve as a forum for resolving legal issues concerning reapportionment. However, the courts should not permit themselves to become a surrogate for the Legislature in this political area, which is properly the province of the legislative and executive branches.

As a court, this body takes *no* position on the political merits of the legislative reapportionment plan or on the outcome of the referenda. Those decisions now rest with the people. This court is concerned with the requirements of the state and federal Constitutions and the impact on the electoral process of a decision by this court. Our goal is to adopt a *temporary* plan that will not be disruptive of the electoral process and does the least amount of violence to the political process.

The only alternative open to the court which meets these criteria is the 1981 reapportionment plan.[26] Even if the referenda result in the rejection of the reapportionment statutes, the election process will undergo no greater disruption than if the out-dated districting plan had been used. However, if the old, unconstitutional plan is adopted, disruption of the election process is assured. Further, constitutional protections of the right to vote and the right to a prompt reapportionment are best served by the adoption of a plan based on the most recent census data.

The referendum power, expressly reserved to the people by the Constitution, is the right to put a statute to a vote by all of the electors. This right must be protected. The outcome of the vote on these referenda may determine the redistricting scheme used for the rest of the decade. Pending the outcome of that vote, this court must follow the mandates of the state and federal Constitutions. Equal protection requires that election districts conform as nearly as is practically possible to the principle of one-person, one-vote. Article XXI of the state Constitution requires that the state be reapportioned each decade. These provisions impel the conclusion that, as a temporary measure, use of the newly fashioned districts is preferable to the imposition of the seriously and unconstitutionally malapportioned districts of the old plan and, therefore, the only alternative.

The *Reinecke I* solution may seem an alluring compromise. However, it requires this court to make the impermissible political judgment that the referenda will fail and places this court in the shortsighted position of ignoring constitutional mandates and encouraging a pattern of court-ordered reapportionment at least once a decade.

This court has repeatedly noted its reluctance to enter into the complex arena of legislative reapportionment. It should by now be clear to the voters and the elected leaders of this state that under the current method of reapportionment, the constitutional requirement of a legislative reapportionment in the year following the federal census could rarely, if ever, be met. Reapportionment by the courts every decade is not only an inadequate solution, but an intolerable one as well. The Legislature should address this problem and fashion a procedure that

---

[26]It is conceded by all sides that there is not sufficient time before the primary to have the court or the Legislature fashion alternative reapportionment plans.

will eliminate the delay and wasted resources caused by the current process.

The 1981 reapportionment statutes governing the Congressional, Senate and Assembly Districts are hereby adopted as a temporary reapportionment plan for the 1982 primary and general elections only. Guided by a proper reluctance to enter into an area of public policy reserved for the people and their elected representatives, this court acts today within the most restricted boundaries consistent with its constitutional duties. The old plans are rejected solely because their grossly malapportioned districts are manifestly unconstitutional. The new plans are temporarily adopted solely because they represent the only alternative available to this court that both maximizes adherence to equal protection principles and minimizes disruption to the election process.

This court's decision is strictly judicial in nature. It does not represent, nor should it be used by anyone as, an endorsement or nonendorsement of the views of either the proponents or opponents of the referenda measures. The people are the proper judges of those matters, as to which this court expresses no opinion whatsoever. It is of paramount importance that acts of judicial necessity not be misused as levers of political expediency.

Since its inception, the right of the people to express their collective will through the power of the referendum has been vigilantly protected by the courts. Thus, it has been held that legislative bodies cannot nullify this power by voting to enact a law identical to a recently rejected referendum measure. (See *Gilbert* v. *Ashley* (1949) 93 Cal.App.2d 414, 415-416 [209 P.2d 50]; *In re Stratham* (1920) 45 Cal.App. 436, 439-440 [187 P. 986].) Unless the new measure is "essentially different" from the rejected provision and is enacted "not in bad faith, and not with intent to evade the effect of the referendum petition," it is invalid. (*Id.*, at p. 440; see also *Reagan* v. *City of Sausalito* (1962) 210 Cal. App.2d 618, 629-631 [26 Cal.Rptr. 775]; *Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 118-119 [1 Cal.Rptr. 307].) Should the referenda here be rejected in the primary election, the Legislature will be governed by these rules in fashioning new reapportionment plans for the remainder of this decade.

The Secretary of State informs this court that she has directed the county clerks and registrars of voters not to provide candidates with pe-

titions in lieu of paying filing fees (§ 6494.1) until these consolidated mandate proceedings have been resolved. Pursuant to section 6555, subdivision (b), these petitions otherwise would have been made available as of January 4, 1982. In order to ensure that all candidates who choose to do so may make use of these procedures, the court directs that the last date on which such petitions may be filed be extended by 24 days. To the extent that the deadlines set for filing declarations of intention to become a candidate (§ 25500) and for filing nomination documents (§ 6490) may impinge upon the implementation of this extension, they should be extended administratively in commensurate fashion for the benefit of those candidates choosing to file in lieu petitions. However, in no event should such extensions be permitted to delay the primary election.

Since there is no reason to believe that the parties to these proceedings will not accede to the holdings of this court, no purpose would be served by issuing writs of mandate. (*Reinecke IV, supra*, 10 Cal.3d at p. 407.)

The alternative writs of mandate heretofore issued are discharged, and the petitions for writs of mandate are denied. Each party shall bear its own costs in the proceedings herein.

The judgment is final forthwith.

Newman, J., Broussard, J., and Tamura, J.,* concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that the referendum petitions are valid and fully qualify for the 1982 primary ballot, that the qualification of the referenda stays the operation of the state Legislature's 1981 reapportionment statutes, and that because of the constraints of federal law and the allocation of two new congressional seats, as a matter of both practical and legal necessity, we should adopt, temporarily, the 1981 legislative enactment of congressional boundaries. I respectfully, but vigorously, dissent, however, from the majority's acceptance of the 1981 legislative enactment of Senate and Assembly district boundaries. In my view, this is most unnecessary, unwise and improper.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

Today, and by the thinnest of margins, the majority accepts as its own and in its entirety, a legislative package, the validity of which is under very serious referendum challenge. It does so in the face of a pending election in which the people of this state will, in just over four months, make a final and definitive judgment on the propriety of this very legislation. The majority is not compelled to do so. It acknowledges, as it must, that the qualification of the referenda for the June 1982 ballot has the effect of fully staying the operation of the 1981 legislation. Nonetheless, the majority completely disregards this stay and imposes upon the people of California a state legislative reapportionment plan which has been stopped dead in its tracks by operation of law and which is heavily veiled in a cloud of political uncertainty. The majority's adoption of this plan prejudges the result and its action can only be perceived as an official alignment of the court with one side in a partisan dispute as to which we should remain scrupulously neutral.

Only 10 years ago we *unanimously* agreed, under circumstances wholly analogous to those presented here, that we would retain the existing legislative district boundaries for the 1972 elections despite their noncompliance with federal one person, one vote principles. (*Legislature* v. *Reinecke* (*Reinecke I*) (1972) 6 Cal.3d 595 [99 Cal.Rptr. 481, 492 P.2d 385].) *Reinecke I* controls the disposition of the present case, and in my view affords the only satisfactory and practical solution consistent with the people's constitutional right of referendum.

Certain general principles must govern our inquiry. First, the referendum and initiative are very special and favored rights. As we recently observed, "The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's. Drafted in light of the theory that all power of government ultimately resides in the people, the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them. Declaring it 'the duty of the courts to jealously guard this right of the people' [citation], the courts have described the initiative and referendum as articulating 'one of the most precious rights of our democratic process' [citation]. '[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' [Citations.]" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d

473, 92 A.L.R.3d 1038]; accord, *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46], cert. den. (1980) 444 U.S. 1049 [62 L.Ed.2d 736, 100 S.Ct. 740].) We are "jealously [to] guard" this "precious" right. As mandated in section 1, article IV, of the state Constitution, "The legislative power of this State is vested in the California Legislature, . . . *but the people reserve to themselves the powers of initiative and referendum.*" (Italics added.)

Second, as the majority is forced to concede, article II, section 10, subdivision (a), of the California Constitution mandates a *stay* of legislation challenged, as here, by a qualified referendum. This subdivision recites: "If a referendum petition is filed against a part of a statute the remainder shall not be delayed from going into effect." By negative implication, if the referendum petition as here is directed to the *entire* statute, the statute is stayed.

Third, again as conceded by the majority, reapportionment statutes are subject to the referendum process. (*Silver* v. *Brown* (1965) 63 Cal.2d 270, 277-278 [46 Cal.Rptr. 308, 405 P.2d 132]; *Yorty* v. *Anderson* (1963) 60 Cal.2d 312, 316-317 [33 Cal.Rptr. 97, 384 P.2d 417]; *Boggs* v. *Jordan* (1928) 204 Cal. 207, 211 [267 P. 696]; *Ortiz* v. *Board of Supervisors* (1980) 107 Cal.App.3d 866, 872 [166 Cal.Rptr. 100].)

Despite the mandatory nature of the foregoing principles of law, however, the majority refuses to stay *any* of the three challenged reapportionment statutes, for purposes of the 1982 elections, relying instead upon what the majority conceives to be overriding federal principles. As I develop below, while a federal statute may require our temporary adoption of the 1981 *congressional* redistricting statute, neither any statute nor overriding principle justifies the majority's complete disregard of the constitutionally ordained stay or the immediate imposition of the stayed legislation upon *state* legislative districts. In ordering the use of these latter districts for the 1982 elections, the majority at the same time both ignores article II, section 10, subdivision (a), of the Constitution, and deliberately thwarts the will of those hundreds of thousands of California voters whose signatures have already qualified the referendum petitions for election to approve or disapprove the reapportionment statutes. The Constitution requires that there be a stay, but the majority refuses to honor it.

The majority finds it anomalous that a "mere" 5 percent of the voters can effectively postpone the Legislature's reapportionment plan. The

answer, of course, is that this was the people's own decision to fix the qualification at 5 percent. In actuality the signatures were in excess of 12 percent and these were speedily obtained. Moreover, this feature of the referendum is no more anomalous than permitting *a single vote* (that of the Governor) to accomplish the same result. (See *Reinecke I, supra*, 6 Cal.3d, at p. 601, wherein we rejected the argument that the Legislature's reapportionment statutes are exempt from the Governor's veto.) The majority's quarrel on this score is more appropriately directed to the framers of the state Constitution and to the people themselves who, in adopting the provision, authored the dual protections of gubernatorial veto and referendum stay as safeguards against legislative abuses.

The majority argues that a stay coupled with the continued use of voting district boundaries created by us in 1973, would violate federal "one person, one vote" principles incorporated in article XXI of the state Constitution. This conclusion is incorrect for reasons which I now develop with reference to the election, respectively, of members of the Assembly, Senate and House of Representatives.

A. *The Assembly*

The present boundaries of Assembly districts were drawn by masters appointed by us in 1973 in *Legislature v. Reinecke (Reinecke IV)* (1973) 10 Cal.3d 396 [110 Cal.Rptr. 718, 516 P.2d 6]. We adopted as our plan these boundaries following a gubernatorial veto of one plan and the failure of the Legislature to adopt another. The present Assembly districts are based on 1970 census figures and, accordingly, do not accurately reflect recent population trends as disclosed by the 1980 census.

While the majority accepts the contestants' view that the referendum stay cannot properly override "one person, one vote" principles, there is no irreconcilable conflict between those principles and the constitutionally mandated stay.

First, nothing contained in article XXI (adopted in 1980) purports to immunize the Legislature's reapportionment statutes from the usual constitutional checks and balances upon the legislative process, including both the Governor's veto and a referendum challenge accompanied by the immediate stay of the operation of such statutes pending the voters' decision. Article XXI simply requires the Legislature to adopt a

plan readjusting voting district boundaries in the year following each national census. Moreover, application of the people's review by the referendum process will not frustrate the purpose of article XXI so long as we retain, as we do, the authority to provide an interim, temporary plan pending that review as discussed below.

Nor are federal one person, one vote principles irreconcilable with the people's right of referendum. As will be seen, the application of these principles need not be instant, immediate and absolute. Rather, of necessity, states are permitted *reasonable* flexibility in adopting and implementing their reapportionment plans, thus permitting *reasonable* delays attributable to referendum challenges. We have so held before under very similar circumstances in *Reinecke I, supra*, wherein we formulated a temporary reapportionment plan for the 1972 elections in which we specifically employed then *existing legislative district boundaries* despite their failure to comply with the constraints of one person, one vote principles. No different result is required in this case.

In *Reinecke I*, the Legislature had adopted a current reapportionment plan, but the Governor had vetoed it, thereby creating the immediate need for *some* plan for the forthcoming elections. We expressly acknowledged that population shifts had occurred and that "the present legislative and congressional apportionments no longer meet the one man, one vote requirement . . . ." (6 Cal.3d, at p. 601.) Nonetheless, rather than temporarily use a vetoed, although current plan, or hastily attempt to prepare an entirely new one of our own without public participation, we specifically permitted the preexisting legislative boundaries to remain in effect for purposes of the 1972 elections. Speaking through then Chief Justice Wright, we said: "We believe that it will be *far less destructive of the integrity of the electoral process to allow the existing legislative districts, imperfect as they may be, to survive for an additional two years than for this court to accept, even temporarily, plans that are at best truncated products of the legislative process.* [Citations.]" (P. 602, italics added.) Our reasoning was clear and unmistakable. It should control the result in the case before us. Despite our express acknowledgment of one person, one vote principles, we held that a *temporary* relaxation of those goals as to *legislative* districts would be consistent with preserving the integrity of the electoral process.

It is interesting that real parties have asserted, without contradiction, that the population variances in the present districts are *less* than those

which we perpetuated in *Reinecke I.* It is equally clear that, in terms of the "integrity of the electoral process," a reapportionment plan which is now subject to a referendum challenge qualified for the June 1982 Primary Election, is comparable to one which, although legislatively authored, has failed to receive the Governor's approval. In each instance the plan is inoperable and stayed. Because the ultimate sovereignty rests in the people, no reason appears for elevating analytically the Governor's veto power above the people's reserved referendum authority, given the independent constitutional foundation of each.

Moreover, *Reinecke I* was fully consistent with federal cases which have held that the application of one person, one vote principles may be temporarily postponed while a state is proceeding in a good faith effort toward reapportionment. (See *Ely* v. *Klahr* (1971) 403 U.S. 108, 114-115 [29 L.Ed.2d 352, 356-357, 91 S.Ct. 1803]; *Lucas* v. *Colorado Gen. Assembly* (1964) 377 U.S. 713, 737 [12 L.Ed.2d 632, 647, 84 S.Ct. 1472]; *Reynolds* v. *Sims* (1964) 377 U.S. 533, 583-585 [12 L.Ed.2d 506, 539-541, 84 S.Ct. 1449]; *Skolnick* v. *Illinois State Electoral Board* (N.D.Ill. 1969) 307 F.Supp. 691, 697.) In *Reynolds*, the high court carefully explained that although decennial reapportionment would satisfy equal protection standards, the governing principle is that the states should adopt "a reasonably conceived plan for periodic readjustment of legislative representation. *While we do not intend to indicate that decennial reapportionment is a constitutional requisite*, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation." (Pp. 583-584 [12 L.Ed.2d pp. 539-540], italics added.) The precise language of the high court which has direct relevancy to the problems before us is as follows: ". . . under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding·the granting of immediately effective relief, in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." (P. 585 [12 L.Ed.2d p. 541].)

In similar fashion, in the matters before us the pendency of a speedily qualified referendum challenge to a reapportionment plan which will be resolved by the people in just over four months likewise amply justifies

temporary use of the existing legislative districts for the forthcoming elections. Here, "an impending election is imminent" and "the state's election machinery is already in progress." Indeed, certain preelection filing deadlines have already been passed, and the Secretary of State and county clerks implore us to act speedily so as not further to disrupt the statutory election machinery. The matters before us are cases to which the foregoing Supreme Court language has precise and unique application.

Those cases which are relied upon by contestants in support of the proposition that one person, one vote principles override the people's referendum right are plainly distinguishable. (See, e.g., *Lucas* v. *Colorado Gen. Assembly, supra,* 377 U.S. 713, 734-737 [12 L.Ed.2d 632, 645-647]; *Silver* v. *Jordan* (S.D.Cal. 1964) 241 F.Supp. 576, 580-583, affd. *sub nom. Jordan* v. *Silver* (1965) 381 U.S. 415, 419-420 [14 L.Ed.2d 689, 691-692, 85 S.Ct. 1572].) These cases quite properly hold that the people's *approval* (through an initiative or referendum) of a reapportionment plan which is violative of *Baker* v. *Carr* (1962) 369 U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691], is constitutionally irrelevant and cannot itself sustain such a plan. Here, an entirely different question is presented, namely, are one person, one vote principles to be so strictly applied as to deny the people themselves their own right to approve or disapprove reapportionment legislation *before* such legislation takes effect? As we have seen on the highest authority, reasonable leeway is permitted in such a case to protect the people's exercise of their precious referendum right. Such a procedure is as soundly established in precedent as it is in principle.

It is urged by the majority that it would be less "disruptive" of, and more "deferential" to, the legislative process were we to purport to acknowledge the vitality of the referendum process on the one hand, while at the same time adopting the very 1981 reapportionment statutes which are challenged and stayed as part of a court-ordered temporary plan for the 1982 elections. The referendum process, however, is necessarily a disruptive, undeferential procedure by which the people halt in their tracks the operation of duly enacted statutes. Nonetheless, the Constitution guarantees that the people's voice shall be both heard and obeyed. It clearly mandates the stay to preserve the effect of the people's will. Any attempt to circumvent such a stay in order to preserve the "orderly" conduct of elections in deference to the Legislature or the Governor, necessarily frustrates and defies the sovereign people. We should be ever mindful that those same democratic values which sus-

tained the high court pronouncement of "one person, one vote" principles in *Baker* v. *Carr, supra*, also form the very foundation for the *constitutionally* authorized referendum and initiative.

Nor should we under the guise of "judicial restraint" adopt the 1981 reapportionment statutes in the face of a qualified referendum challenge which has stayed those very statutes.

In terms of judicial restraint, the choice before us in this case is similar to the choice we confronted in *Reinecke I.* As here, the choice in *Reinecke I* was between old, malapportioned districts and a new reapportionment plan that had been adopted by a majority of the state's elected legislative representatives. In *Reinecke I,* of course, the new districts were not effective because the Governor had vetoed the plan, while here the new districts are not effective because the referendum process has stayed the plan; in both instances, however, the legislative process contemplated by the California Constitution did not result in an effective reapportionment plan.

In *Reinecke I* we did not view the adoption of the "truncated" legislative plan as a choice properly dictated by any considerations of "judicial restraint" even though the plan had been passed by a majority of the state's elected representatives and was closer to one person, one vote principles than the old districts. On the contrary, we emphasized: "Only the most compelling considerations would impel us to disregard the solemn vetoes of the Governor and to adopt the plans passed by the Legislature as court plans, at least in the absence of a complete hearing, . . . which would allow us to exercise a fully informed and independent judgment with respect to those plans. Insofar as reapportionment of the Legislature is concerned, we find no such compelling considerations." (6 Cal.3d, at p. 602.) Should we now accord less "solemn" weight to the *people's* proscription of the statutes than a Governor's veto? Not under any system in which the people are sovereign.

In reaching our conclusion in *Reinecke I,* we implicitly recognized that our court's automatic adoption of a "truncated" or incomplete legislative proposal would not represent appropriate judicial deference to a product of the state's constitutionally contemplated legislative process which, as of then, was incomplete. Similarly, in the cases before us our adoption of the 1981 plans amounts to judicial intervention into that process, thereby undermining the checks and balances which our state Constitution has consciously built into the legislative scheme to guard

against a tyranny of a temporary representative majority. In each instance, these checks and balances on the actions of the Legislature—the gubernatorial veto in *Reinecke I*, the reserved referendum power here —serve the important purpose of moderating the actions of a current majority of lawmakers, helping to ensure that the interests of a broad range of affected individuals are considered in the enactment of legislation. (See generally, The Federalist, No. LXXIII (Hamilton) (1942 ed.) Book II, pp. 72-74.) Moreover, it seems clear that these checks and balances are at least as significant with respect to reapportionment statutes as with respect to other legislation, for in the reapportionment context there is a particularly serious danger that narrow partisan considerations may be given undue weight by a current legislative majority at the expense of the general citizenry's broader interest in competitive districts and electorally responsive representatives. (See *Reinecke IV, supra*, 10 Cal.3d 396, 402-403, 416-417.)

When a court accords automatic "deference" to a legislative plan that has been "checked" by one of the constitutionally designed checks and balances, it inevitably diminishes the salutary tempering effect served by the constitutional safeguard. Thus, for example, if we had automatically adopted the vetoed state legislative reapportionment in *Reinecke I* as an interim plan, we would have lessened the incentive or need of the majority party to take into account the interests of minority party or independent voters so as to secure the signature of the "minority party" Governor. Similarly, when in the present case we adopt the incomplete legislative plan despite the operation of the referendum stay provision, we inevitably reduce this check on self-serving political action that is provided by the referendum power. On the other hand, if we respect and give effect to the referendum provision, and if the Legislature recognizes that this power may be utilized by the people to prevent a narrowly partisan plan from taking effect, legislators in the future are more likely to attempt to ensure that the fairness of the plan they adopt is generally apparent to the public at large. That is one important purpose of the reserved referendum power.

In sum, contrary to the majority's analysis, we do not exercise proper "judicial restraint" or appropriate "deference to the legislative process" when we ignore the constitutionally mandated stay and adopt the 1981 legislative redistricting plans.

For all of the foregoing reasons, I conclude that the state Assembly boundaries which were adopted by us and based on our masters' plan,

rather than the new challenged and stayed ones, should govern the 1982 elections. I emphasize, however, that I would not foreclose the Legislature, if it deems it practical, from adopting in good faith a reapportionment plan substantially different from that adopted in 1981, for purposes of the 1982 and subsequent elections. (See *Reinecke I, supra,* 6 Cal.3d, at pp. 602-604; *Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 118-119 [1 Cal.Rptr. 307].)

### B. *The Senate*

The Senate petition (S.F. 24356) recites that the Senate was elected from 40 districts drawn by us in 1973 in *Reinecke IV*, and that because of population growth and shifts these districts no longer assure compliance with one person, one vote principles.

Although all 40 senatorial districts were redrawn by a statute challenged by the Senate referendum petition (Stats. 1981, ch. 536), a subsequent amendment thereto (ch. 538) purported to redraw further 12 of these districts. This later amendment was not included in the referendum attack. The Senate contestants argue that the referendum cannot preserve the existing Senate district boundaries, because some of these boundaries are irreconcilable with the 12 new, unchallenged district boundaries.

It is conceded, however, that these 12 new districts interlock with the boundaries drawn in challenged chapter 536 and, accordingly, are wholly dependent upon the validity of those remodeled boundaries. If the referendum successfully abrogates chapter 536, then chapter 538 must, of necessity, likewise fail. An examination of the two statutes discloses that chapter 538 readopts almost all of the boundaries previously adopted by chapter 536, making only very minor changes in the 12 districts affected. In fact, chapter 538 evidently was introduced only as a "trailer" or "clean-up" bill designed to correct minor typographical errors in chapter 536 rather than to achieve a substantive revision thereof. Because the alterations made by chapter 538 were minor, and because the boundaries drawn in that chapter were dependent upon the boundaries drawn in the original statute, real parties are correct in assuming that chapter 538 should stand or fall with chapter 536. The referendum process should not be rendered ineffective by the mere reenactment of a challenged plan coupled with inconsequential amendments thereto. The correct test within this context is well established. It is "whether the second legislative enactment is essentially the same as the first," al-

though the legislative body may "'deal further with the subject matter of the suspended ordinance, by enacting an ordinance *essentially different* from the ordinance protested against . . . .'" (*Martin v. Smith, supra,* 176 Cal.App.2d 115, 118-119, italics added; see *Reagan v. City of Sausalito* (1962) 210 Cal.App.2d 618, 629-630 [26 Cal.Rptr. 775]; *In re Stratham* (1920) 45 Cal.App. 436, 439-440 [187 P. 986]; Annot. (1954) 33 A.L.R.2d 1118, 1131-1134; Comment (1949) 49 Colum. L.Rev. 705, 706-707.) *Martin* also requires legislative "good faith" and "'no intent to evade the effect of the referendum petition. . . .'" (P. 119.) The foregoing principles are sound and should apply in assessing the effect of chapter 538 under the circumstances of this case.

Based upon the same reasons which support the foregoing analysis of the Assembly petitions, I conclude that the newly adopted senatorial boundaries are similarly stayed by the qualification of the referendum petition which directly challenges them. The masters' boundaries previously adopted by us should be used temporarily for the purposes of conducting the 1982 senatorial elections.

## C. *The House of Representatives*

Although agreeing with the majority's conclusion to use the 1981 legislative plan for congressional districts, I explain the reasons which distinguish congressional from state legislative elections. The House petition (S.F. 24354) alleges that according to the 1980 census, California is entitled to 45 House members, 2 more than those authorized by the 1970 census figures. The 1981 House reapportionment law (Stats. 1981, ch. 535) divides the state into 45 new districts reapportioned in accordance with changes in population reflected by the new census. According to the House contestants, continued use of the forty-three old voting district boundaries would not only violate one person, one vote principles, but also would deprive California of two new House seats. However, a serious challenge is directed both to the underlying fairness of the 1981 congressional boundaries as drawn by the Legislature and to their compliance with article XXI, section 1, subdivisions (c) and (e).

In *Reinecke I, supra,* 6 Cal.3d 595, facing a very similar problem, we adopted a temporary plan for the 1972 elections which retained the pre-existing boundaries for the legislative districts but used the new, although vetoed, congressional boundaries. We observed in that case that California was entitled to five new House seats which, in the absence of a valid legislative reapportionment, "will either have to be left

unfilled or filled by statewide elections." (6 Cal.3d, at p. 603.) We rejected the latter option, reasoning that "to conduct statewide elections to fill five congressional seats in a state of California's geographical size and large population would not only tremendously increase the burdens and expenses of effective campaigning but, by increasing the choices confronting the electorate from the candidates for one to the candidates for six congressional seats, would seriously impede the casting of informed ballots." (*Ibid.*) We further stressed that although the Legislature's congressional reapportionment plan had been vetoed by the Governor, it had bipartisan support from all members of the House. (*Ibid.*)

Real parties distinguish *Reinecke I* from the present case on two grounds: (1) Only two, not five, additional House seats are involved, very substantially reducing the burdens, expense and confusion of a statewide election, and (2) the plan involved here enjoys no visible bipartisan support. (I note, however, that both the Republican and Democratic members of the California congressional delegation are united in their opposition to the continued use of old congressional boundaries.)

I believe, however, that aside from the practical considerations disfavoring at large elections of new congressional representatives, and contrary to the case of state legislative elections, federal law expressly forbids at large congressional elections. Thus, in *Reinecke I* we noted that "Congress has expressly provided that California shall elect [its representatives] from . . . single member districts." (6 Cal.3d, at p. 603, fn. omitted.) We relied in this regard on section 2c of title 2 of the United States Code, which provides that "In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to section 2a(b) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, *and Representatives shall be elected only from districts so established . . . .*" (Italics added.)

Real parties rely, however, upon 2 United States Code, section 2a(c), which mandates that "*Until a State is redistricted in the manner provided by the law thereof after any apportionment,* the Representatives to which such State is entitled under such apportionment shall be elected in the following manner: . . . (2) *if there is an increase in the*

*number of Representatives*, [they] *shall be elected from the State at large and the other Representatives from the districts then prescribed by the law of each State*; . . . ." (Italics added.) Real parties urge that this section supports the temporary use of the former House district boundaries, coupled with statewide election of two additional members serving at large. Under this analysis, section 2a(c), is invoked before a redistricting plan has been adopted, while section 2c applies only after such adoption.

Although the question is close, I am persuaded that section 2c, enacted in 1967, was intended to replace, and has implicitly repealed, section 2a(c). By its very terms section 2c adopted a new procedure governing the 91st and subsequent congressional sessions whereby any additional representatives to which a state became entitled under its reapportionment plan were to be elected *only* from single member districts. In the present case, although the Legislature's own redistricting has been stayed by operation of law, this court, in fashioning our own interim plan for the 1982 elections, must abide by the apparent federal mandate reflected in section 2c.

Considerably less flexibility is permitted in applying one person, one vote principles to congressional voting boundaries. (See *White* v. *Weiser* (1973) 412 U.S. 783, 790-793 [37 L.Ed.2d 335, 343-345, 93 S.Ct. 2348]; *Kirkpatrick* v. *Preisler* (1969) 394 U.S. 526, 531, 533-536 [22 L.Ed.2d 519, 524, 526-528, 89 S.Ct. 1225].) Although a reasonable delay in implementing an updated plan for state legislative boundaries is expressly allowed by the high court in appropriate cases (*Reynolds* v. *Sims, supra*, 377 U.S. 533, 583-584 [12 L.Ed.2d 506, 539-541]), it is much less clear that such a delay is permissible in establishing new congressional districts. There is thus a clear distinction between congressional elections, on the one hand, and state legislative districts, on the other.

In *Reinecke I*, we acknowledged that "We regret, of course, that the only readily available congressional reapportionment plan is one that has been vetoed by the Governor." (6 Cal.3d, at p. 603.) In similar fashion, in the present case I regret that the only readily available congressional plan is one which is clouded by a pending, qualified referendum challenge. Yet, under federal supremacy principles, we must abide by the mandate of applicable federal law in controlling federal elections.

D. *Conclusion*

Thus, I conclude that although the 1981 congressional reapportionment plan must govern the 1982 elections, we should not use the 1981 legislative boundaries for that purpose.

Two more practical consequences make the majority's rejection of our previous *Reinecke I* solution most unwise. The majority seriously errs in assuming (*ante*, p. 668) that utilizing the challenged and stayed 1981 reapportionment plans somehow "minimizes the potential disruption of the electoral process." By following our *Reinecke I* precedent, we do not invite "the worst possible scenario" as asserted by the majority. (*Ante*, p. 669.) To the contrary, that dubious distinction belongs to the majority, for it would switch from our old *Reinecke IV* masters' districts to the 1981 legislative plans, and if the people reject those plans in their referenda vote, we would switch to a *third* plan for the 1984 elections. Thus, each voter will have voted, and candidates will have run, in *three* differently constituted districts in the space of four years and one day. *That* is *real* disruption. *That* is the "worst possible scenario."

Moreover, the majority creates an absolutely intolerable anomaly if the voters reject the 1981 redistricting laws. The new districts that will be effective for the remainder of the decade will almost certainly be drawn by a Legislature which has been elected on the basis of a reapportionment scheme which the voters have just rejected. This factor would make it even less likely that the next reapportionment plan will be the result of compromise or that the Legislature will recognize the general electorate's interest in competitive districts and electorally responsive representatives. As a direct consequence, repeated referenda are a near certainty. Moreover, by imposing the stayed 1981 legislatively created boundaries, candidates for both the 1982 Primary and General Elections will then be running in districts, the boundaries of which are nonexistent because they have been rejected by the people. The districts then would draw life only from our fiat issued in defiance of the people's recently expressed will.

Believing that we cannot improve upon it, I would follow the path carefully defined by us in *Reinecke I* and order that, for purposes of the 1982 elections, the existing legislative boundaries and the new congressional boundaries should be used. The majority's ruling, which requires the use of *all three* challenged reapportionment plans for the forthcom-

ing elections, totally defeats the reserved referendum power of the people and the constitutional mandate requiring an *immediate and continuing stay* of the legislation. It also frustrates the self-evident intent of hundreds of thousands of our citizens who in good faith and pursuant to law signed the referendum petitions to permit a review and a public vote upon these plans *before they take effect.* These plans, like those in *Reinecke I*, are merely incomplete products of the legislative process; they will become final and effective only if, as, and when the people have expressed their sovereign will. We should not interrupt that process by a judicial device. The legislative districts should remain exactly as they were until the people have spoken.

Mosk, J., and Kaus, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I join Justice Richardson's concurring and dissenting opinion. His position is irrefutable. Nevertheless, a bare majority of this court have become entangled in the "political thicket" by ignoring their obligation of neutrality on a partisan issue, a neutrality that can be observed only by maintenance of the status quo in legislative districting until the people speak at the forthcoming election. *Legislature* v. *Reinecke* (1972) 6 Cal.3d 595 [99 Cal. Rptr. 481, 492 P.2d 385], written by Chief Justice Wright and concurred in by a unanimous court, charts the course we should follow.

An additional observation on the problem is appropriate. One need not be a cynic to detect the hypocrisy in the political gamesmanship known as reapportionment. Whichever party is in power immediately following the decennial census inevitably undertakes the task with a view to its self-preservation, and the opposition cries foul. The reality is that neither party has a monopoly on virtue. As a result, every 10 years hereafter we may be compelled to endure a gubernatorial veto or a referendum sponsored by the party out of power—perhaps successive referenda after further reapportioning efforts—and to that extent the legislative and political processes of this state will become periodically impotent.

At present the courts can do little to prevent this decennial debacle. Justice Frankfurter clearly saw the issue and the restricted role of the judiciary nearly four decades ago. In *Colegrove* v. *Green* (1946) 328 U.S. 549, 554 [90 L.Ed. 1432, 1435, 66 S.Ct. 1198], he observed that "The one stark fact that emerges from a study of the history of ... apportionment is its embroilment in politics, in the sense of party contests

and party interests." He concluded (328 U.S. at p. 556 [90 L.Ed. at p. 1436]) that *"Courts ought not to enter this political thicket. The remedy for unfairness in districting is to secure State legislatures that will apportion properly* .... The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights." (Italics added.)

Although it is not the responsibility of the judiciary to solve this essentially political problem, I cannot resist suggesting that a better solution to achieving equitable reapportionment must be found if the people of California are to be served effectively. What that solution should be is beyond my ken. But the wrenching experiences of 1971 and 1981 indicate the people and their representatives should tarry no longer in seeking an answer.

**KAUS, J.,** Concurring and Dissenting.—Obviously much is to be said on each side of the only issue that divides the majority and Justice Richardson's dissent which I have signed. The two considerations which, in my view, tip the scale in favor of the dissent are these: First, simple adherence to precedent should make us follow *Reinecke I.*[1] Second, it seems clear to me that the course chosen by the majority involves greater judicial intrusion into the legislative process laid out by the California Constitution. Absent compulsion by *Baker* v. *Carr*—and I see none—we should let that process play itself out without any judicial intervention.

---

[1] I pity the 1992 Supreme Court which will have to break the tie between *Reinecke I* and *Assembly* v. *Deukmejian.*